STATE v. M. A. HATCH.[1]

November 16, 1917.

No. 20,537.

**Trial — conflict of testimony — charge to jury.**

1. A statement in a charge to the jury, that the testimony is squarely in conflict and that some of the witnesses have committed perjury, but that it is for the jury to say who is to be believed, is not an erroneous charge.

**Miscarriage — when not manslaughter — danger of death.**

2. General Statutes 1913, § 8610, makes the procurement of a miscarriage resulting in death, manslaughter, "unless the same is necessary to preserve * * * life." In order to bring a case within the exception it is not necessary that the danger of death be immediate.

**Same — charge to jury.**

3. An instruction that to bring a case within the exception the danger of death must be immediate, is not, however, erroneous, where the defense is predicated on the existence of immediate danger to life.

Defendant was indicted by the grand jury for the crime of manslaughter, tried in the district court for Hennepin county before Jelley, J., and a jury which found defendant guilty as charged in the indictment. From an order denying his motion for a new trial, defendant appealed. Affirmed.

*Donald G. Hughes* and *Charles B. Elliott,* for appellant.

*Lyndon A. Smith,* Attorney General, *John M. Rees,* County Attorney, and *Walter H. Newton,* First Assistant County Attorney, for respondent.

HALLAM, J.

Defendant was convicted of manslaughter under G. S. 1913, § 8610, which reads as follows:

"Every person who shall wilfully kill an unborn quick child by any injury inflicted upon the person of its mother * * * or who shall use or

[1] Reported in 164 N. W. 1017.

employ * * * any instrument or other means, with intent thereby to procure the miscarriage of a woman, unless the same is necessary to preserve her life, and the death of the woman, or that of any quick child of which she is pregnant, is thereby produced, shall be guilty of manslaughter in the first degree."

Defendant is a physician and surgeon. He had seen fit to engage in a branch of practice which consisted largely in the treatment of women who desired to be relieved from pregnancy with the purpose of bringing such relief by abortion where the case was "perfectly legitimate" and the patient "needed to be operated upon." He testified that since he had had some "trouble" and "paper publicity" in such cases, patients of that kind had come to him "almost in droves." His office attendant testified that more patients came than they had room for and that letters came in "sometimes a bushel a day." It was admitted that defendant procured the miscarriage of one of these patients, Louise Halvorson, a woman two months pregnant and that her death resulted soon thereafter. The defense was that the miscarriage which produced her death was "necessary to preserve her life." The jury rejected this theory and no question is raised but that the evidence is abundantly sufficient to support this verdict.

There are but two assignments of error. Both relate to the charge of the court to the jury.

1. The court told the jury this:

"You realize as well as the court does, that certain of the witnesses who have testified in this case have not told the truth, and in doing so they have not made an honest mistake for which they can be excused, but they have knowingly testified falsely, they have intentionally, wilfully and purposely committed perjury, in direct violation of their sworn oaths as witnesses. You cannot believe all of them, you must disbelieve some of them, but it is for you to say whom you will believe, whom you will disbelieve, and reconciling the testimony where it differs and harmonizing it where it conflicts, sift out the truth, as you find and believe it to be and return your verdict upon that and that alone."

Defendant contends that it was inevitable that the jury should infer that the court had in mind the defendant's witnesses when he referred to certain of the witnesses as having testified falsely. No such inference

was possible. The evidence was, on some points, in irreconcilable conflict. We see no objection to the court's calling attention to that fact. In no way did the court intimate his opinion as to which set of witnesses testified falsely. There was no error in this part of the charge.

2. The court charged the jury as follows:

"Gentlemen, all of the evidence of the case bearing upon the question as to whether or not it was necessary to cause Louise Halvorson to miscarry to preserve her life is before you. And in that connection, gentlemen, you are instructed in regard to the question of the necessity of the miscarriage to preserve the life of Louise Halvorson, that what is meant by that term was the immediate preservation of her life, not a future, indefinite danger arising at some distant time through childbirth. The question is and then was, not whether Louise Halvorson was in such a condition of health when she called upon Doctor Hatch by reason of being pregnant, that if permitted to go her full period, she would or might die in giving birth to the child with which she was then pregnant, and that, therefore, at the time of her call, it was necessary to produce her miscarriage, but was it necessary to produce her miscarriage, to perform the operation then and there and when he did, to immediately preserve her life? That is the question for you to determine from the evidence, gentlemen, as to that phase of the case."

This charge, in the abstract, was not correct. The statute excepts from its operation, cases where a miscarriage is necessary to preserve life. The statute does not say that in order to bring a case within the exception, the danger of death must be immediate, and it should not be so construed.

3. It does not follow, however, that this language of the charge was reversible error. We think it was not. The claim of the defense on the trial was, not that the miscarriage was produced because of any expected danger of death at childbirth, or at any remote time, but because of a danger that was immediate: This theory of the case is manifest throughout the record. The evidence of defendant himself makes it clear that the danger to life, on which he relied, was an immediate danger. This being the claim and theory of the defense, an instruction that the danger must be immediate in order to constitute a defense could not prejudice the defendant.

Defendant's counsel calls attention to some evidence of the defendant to the effect that deceased would have found childbirth a serious matter. He said she was 35 years of age, that she had "a flat chest" and was "pale." He gave this further testimony; "She was small boned and of an age when it would be almost impossible for her to have a normal child at nine months because she had never had a child, and when a woman dosen't have a child until she is 35 years of age it is a pretty serious matter under any condition, but with a woman who is small boned, rather close built and the bones thoroughly hardened as they are then, and in a run-down condition, poor and rather weak, and by the way I examined her heart and found it was weak, it makes an extremely serious matter of it."

As above indicated, we think a condition might arise before the end of pregnancy where the danger from childbirth could fairly be considered so grave as to warrant the procurement of a miscarriage in order to save life, but clearly the statute was not designed to legitimize abortion under any such state of facts as above detailed. Any such construction of the exception contained in this statute would inevitably lead to great abuses.

But as above stated, the defendant did not on the trial in district court claim that this miscarriage was procured because of any prospective danger to deceased at childbirth. On the contrary, he himself testified that his diagnosis was that there never could be a childbirth, that the foetus was dead, that it had become infected, was disintegrating, putrefying and rotten; that there was the beginning of septicemia; that by reason of these conditions the patient had temperature; that it was absolutely necessary to remove the foetus at once; that the condition of the patient was "critical" and that was the reason he performed the operation; that after he removed the foetus he discovered facts that corroborated his diagnosis and indicated that the foetus was dead and was beginning to decay. He stated in one part of his testimony "in a case like this where there is reason to suppose that it is putrefying, where there is temperature, it is absolutely necessary to remove it, it has got to be done." It was doubtless because of this theory of the defense that the attorneys who represented defendant on the trial took no exception to this instruction at the trial, nor in their motion for a new trial, that no objection was raised to it until after the motion for a new trial

had been denied and other counsel who had not participated in the trial had been called into the case.

We think there was no prejudicial error in the charge.

Order affirmed.