STATE OF IOWA, v. O. H. P. SHOEMAKER, Appellant.

**Criminal law:** ABORTION : NECESSITY TO SAVE LIFE : EVIDENCE. On the prosecution of a physician for abortion the burden is upon the state to negative the defendant's good faith exercise of his best skill and understanding, believing the operation necessary to save the patient's life. In the instant case the evidence is held insufficient to show that defendant did not in good faith and in the exercise of skill and understanding believe that the operation was necessary to save the life of the patient.

*Appeal from Polk District Court.*—HON. C. S. BRADSHAW, Judge.

THURSDAY, NOVEMBER 14, 1912.

THE defendant was convicted of having attempted to produce a miscarriage, and appeals.—*Reversed and remanded.*

*Sullivan & Sullivan,* and *W. S. Shoemaker,* for appellant.

*George Cosson,* Attorney General, and *John Fletcher,* Assistant Attorney General, for the State.

LADD, J.—The defendant, a practicing physician of Des Moines since 1883, is charged in the indictment with having attempted to produce a miscarriage on Stella Thorne about October 19, 1910. He admitted having used an instrument to relieve the womb of the fœtus, but claimed to have done so, to save life. As the fœtus was emitted two days later, the main issue was whether defendant, in the exercise of his best skill and understanding in good faith, believed a miscarriage necessary to save the life of Stella Thorne. The burden of proof was on the state to negative such alleged necessity (*State v. Aiken,* 109 Iowa, 643), and a careful examination of the record has convinced us that it has failed to so prove.

Stella Thorne was an unmarried woman about twenty-two years of age, and had been pregnant for three or four months when she first called on the defendant at his office. At that time, according to her testimony, she told him of her condition, and he promised to help her all he could, but said, if she was after an abortion, he could not perform it, felt her pulse, ascertained her temperature, and informed her she was in bad condition, looked like she had anæmia and declared she had already aborted, and needed assistance to take the fœtus away. He then said he must have $50 before he would do anything, and when she said she was without means, offered to accept part down and the remainder later. He also required her to

employ a nurse, because her heart was weak. On Tuesday evening following she was accompanied by Harvey Ramey, who paid him $35 and executed his note for the remaining $15. The defendant then examined her, and on the next evening the operation was performed, and two days later the fœtus was expelled. The witness further testified that she had not worked during the two weeks previous, but had walked down town nearly every day; that she had been taking medicine previously to produce an abortion, prescribed by a male and also a female physician; that she had said as much to him; that upon examination he had informed her that she was in pretty bad condition, had anæmia, that her heart was weak, and that she had already aborted septic matter, and needed some assistance to take that away; and that she must have a nurse and "He said it might be dangerous for me to wait three or four days, and he took me and made an examination in the private room, and when he examined me he found pain on the left side of my womb, and I had pains in my back and back of my head. After he made the examination, he found my womb standing wide open, and there was abrasions of the membranes around the womb, and that the membranes had been broken or abrased, and he said that it would be dangerous in that condition to let it remain very long, as it might kill me; that that thing that was in there would have to be taken away to save my life, and then I made arrangements to come down the next evening with the nurse, and I brought Miss Morris down." She also testified that she "was looking pale and sallow." That she had been complaining of being sick before calling on defendant appears from the testimony of Mrs. Clark, at whose house she was rooming, and Harvey Ramey testified to her having nearly fainted at a theater shortly before, and to her statement that she was taking medicine to cause a miscarriage. Ramey testified further that: "The doctor told me in her presence that it was

necessary for her to have a nurse, that she would have to be there the next evening, and the next evening Stella Thorne, the nurse, and myself came to the office again. When the nurse came, he explained to her that this was perfectly legitimate, and that it was necessary to have a nurse, because of Miss Thorne's weak condition, weak heart, and the taking of the medicines she had taken, and other things that she had done; and the doctor insisted that the nurse should stay with the girl from start to the finish, or he would not have anything to do with it, and I think the first time we were there he made an examination, and I was informed that evening that it was necessary for her to be operated on at once, and the next evening was set for the operation, and the nurse came. He was in there not very long during the operation, and after that he gave her some medicine to take under certain conditions, and how to take it." The nurse testified that, prior to the operation, defendant explained to her how to administer the medicines he had prescribed; that he told her Miss Thorne was pregnant, and that "he had to operate on her to save her life," and that when the child came he told her to cremate it, and, on cross-examination, that: "The doctor said, the night I was at the office, it was necessary to have an operation to save her life. He also said that it was an important point that I should stay about the patient and not leave her. He said that her heart was weak by the absorption of septic matter from the womb and other things. He said it was no crime that I was committing, but a necessary matter; that there was no secret about it. He did not ask me to be secret about it, or not tell anybody. He told me not to leave her alone for any length of time, and if there was any change or anything to notify him by telephone." This is all the evidence adduced by the state tending to negative the exception in the statute that the attempt to produce the miscarriage was to save life.

On the other hand, defendant testified that what he did was necessary to save the life of the patient, that she had anæmia from septic poisoning, and that septic poisoning came from the absorption from the uterus, and concerning the examination: "I looked her over again, as I do any patient, felt her pulse, put her in the chair, made a practical examination, and examination over the region by percussion, the abdominal region, and found tenderness on percussion. I found the uterus rolled down on the outside, and very much soreness on the right-hand side of the patient in the broad ligaments or uterine region. Then I also made what is called a vaginal examination, and found the vagina hot, sensitive, and very tender. I found the mouth open, and I passed the finger in and found the cervix wide open. I passed my finger clear through to the inner mouth, and found it open, and I found the membrane tampered with, with an instrument, a catheter, or something of that kind, and the womb swollen; that is, the neck swollen and very sensitive." It will be observed that his testimony is in harmony with that of the witnesses of the state. The evidence concerning the condition of Stella Thorne is in no wise refuted, save possibly by the circumstance that she had walked back and forth from the office of the accused, and prior thereto had walked down town. Whether this would have been improbable or impossible, with her condition as described, the jury had no means of knowing. The record does not warrant the conclusion that defendant was "framing up" a defense in event of prosecution, and, while appreciating the difficulties under which the state labors in this kind of a prosecution (*State v. Lee,* 113 Iowa, 348), we are not ready to sanction a conviction without *prima facie* proof, at least, that the miscarriage attempted was not necessary to save life.

Owing to our conclusion on this phase of the case, an examination of other errors assigned is not necessary.

Because of the insufficiency of the evidence to justify the conviction, the judgment is reversed.—*Reversed and remanded.*