STATE OF IOWA, Appellee, v. HAROLD DUNKLEBARGER, Appellant.

OCTOBER 23, 1928.

*Fisher & Riter*, for appellant.

*John Fletcher* and *Neill Garrett*, for appellee.

EVANS, J.—The prosecutrix is Grace Gately, who in September, 1925, at the age of 15 years, became pregnant. The wife of the defendant is the aunt of the prosecutrix. It is not claimed that the defendant was in any manner responsible for the condition of the prosecutrix. On that question, the case has a dark background, which was not penetrated at the trial. But nothing therein reflects in any degree upon the character or conduct of the defendant, preceding the alleged offense for which he is prosecuted. Nor does the State claim otherwise. When Grace was 10 years old, her mother died, survived by her husband, John Gately, and three children, of which the oldest was Grace. The family lived upon a farm near Rock Rapids, and continued to so live after the death of the mother. Mrs. Gately left sur-

viving her, also, two sisters, Mrs. Jaeger and Mrs. Dunklebarger. Mrs. Jaeger and her husband lived on a farm near by, and Mrs. Dunklebarger and her husband lived in the city of Rock Rapids, occupying a small apartment therein. The two sisters of the dead mother mothered the little family of their deceased sister to the utmost of their ability. In December, 1925, rumor came to the ears of the aunts that the child, Grace, had been defiled, and was then in pregnant condition. This discovery resulted in a conference between the aunts and their husbands, and Ray Gately (brother of John Gately) and his wife. No conference appears to have been had with the father of Grace. The result of the conference was that Grace was taken by Mr. and Mrs. Jaeger to Dr. Chalmers, in the town of George, for an examination. This examination resulted in a verification of their fears. This occurred on the 7th day of December, 1925. Later, and about the middle of December, Dr. Wallace, of Rock Rapids, was consulted. The defendant participated in this consultation. The purport of this consultation was that Grace was in a highly nervous condition, and was threatening to kill herself, and was complaining of much pain. The doctor gave them two prescriptions of medicine,—one was a sedative, and the other a laxative. These prescriptions were filled, and the medicine was used for two or three weeks, without apparent benefit. In the meantime, according to the testimony for the defense, the nervous condition continued, and many apparent efforts were made by Grace to injure herself by jumping from an elevation of 8 or 10 feet in a haymow, and by the use of instruments upon her person. On Sunday night, January 10, 1926, she was brought to the city of Rock Rapids by the two uncles, Jaeger and Dunklebarger, for a consultation and further examination by Dr. Wallace. An examination was made by Dr. Wallace by the use of a speculum, whereby he discovered, as he claims, that the fetus was already dead, and that a miscarriage was inevitable, according to the course of nature. After the examination, Grace returned to the home of the Jaegers, and on Tuesday morning following, a miscarriage resulted. In the making of the examination by Dr. Wallace, the defendant, Dunklebarger, held the light for the doctor, at his request. This is the act which constitutes the gist of defendant's alleged crime.

Many grounds of reversal are assigned by the appellant.

The more important one raises the question of the sufficiency of the evidence to sustain the conviction, and we turn our attention thereto.

I. The defendant was a laboring man, working for wages in the engineering department of Lyon County. So far as appears from the record, he had no motive of self-protection, and no interest to subserve in any of the matters hereinafter recited, other than the interests of the child, herself. Dr. Wallace was a physician, duly admitted to practice, and in good standing, and had been engaged in the practice in Rock Rapids for 45 years. Section 12973 of the present Code provides:

"12973. If any person, with intent to produce the miscarriage of any woman, willfully administer to her any drug or substance whatever, or, with such intent, use any instrument or other means whatever, unless such miscarriage shall be necessary to save her life, he shall be imprisoned in the penitentiary for a term not exceeding five years, and be fined in a sum not exceeding one thousand dollars."

The indictment in this case charges that the attempt was made only by the "use of an instrument." No charge was made that any drug was used. From our foregoing preliminary statement, it is manifest that Dunklebarger could not be guilty of the alleged crime unless Dr. Wallace was likewise guilty thereof. The court, in effect, so charged the jury by Instruction No. 7. The ultimate question submitted by the court to the jury was whether the defendant aided and abetted Dr. Wallace in the commission of the offense charged. The court also charged the jury that the State must prove, not only that Dr. Wallace intentionally produced the miscarriage, but that said miscarriage was not necessary, to save the life of prosecutrix. In a later instruction, the court also advised the jury that, if Dr. Wallace in good faith believed that a miscarriage was necessary to save the life of the patient, or if he in good faith believed that the fetus was already dead, then, in such event, the defendant must be acquitted. We direct our inquiry, therefore, to the sufficiency of the evidence to prove the guilt of Dr. Wallace in the premises.

Dr. Wallace testified that his examination disclosed a condition which must result in miscarriage, in the ordinary course

of nature; that an early consummation of such result would tend to the security of the patient's life; and that delay would increase the mortal risk. The major fact of such condition was that the fetus was already dead. The question whether miscarriage was necessary to save the life of the patient was necessarily, upon this record, a question of medical opinion. The question whether the fetus was living or dead could be a controlling feature as the basis of medical opinion. If the fetus were in fact dead, then all the medical opinion concedes that miscarriage was inevitable ultimately, and that the sooner it were accomplished, the safer the patient. Even if the fetus were still living, there might be other conditions which would create a division of medical opinion on the question of necessity, for the saving of life. Inasmuch as the question of necessity can ordinarily be determined only by medical opinion, it follows naturally that a physician who examines a patient must form an opinion in good faith, and must act upon it in like good faith. It follows also that, if a regular physician does make an examination, and does form an opinion, and does act upon it, he is entitled to the presumption of correct judgment and good faith, until the contrary be proven. The burden was upon the State, not only to prove that the operation was not necessary to save the patient, but that Dr. Wallace did not in good faith believe that it was necessary. This rule was recognized by us in *State v. Shoemaker*, 157 Iowa 176, as follows:

"He admitted having used an instrument to relieve the womb of the fœtus, but claimed to have done so to save life. As the fœtus was emitted two days later, the *main issue was whether defendant, in the exercise of his best skill and understanding, in good faith, believed a miscarriage necessary, to save the life of Stella Thorne.* The burden of * * * proof was on the State to negative such alleged necessity, and a careful examination of the record has convinced us that it has failed to so prove."

See, also, *State v. Moon*, 167 Iowa 26. In *State v. Aiken*, 109 Iowa 643, we said:

"The woman was advanced in pregnancy for from five to six months, and the operation was successfully performed. There is no evidence of illicit intercourse, no showing as to whether

she was married or unmarried, and nothing to indicate the condition of her health, except that she walked to the office of the defendant two or three times. Surely this does not prove beyond a reasonable doubt that the miscarriage was not necessary to save the life of the mother. And we are of opinion that it does not make out even a prima-facie case. It is a matter of common knowledge that many persons walk to hospitals and to offices to have operations performed that are necessary to save life. *Every presumption is in favor of defendant's innocence, and, if the facts shown are capable of explanation on any reasonable hypothesis in favor of innocence, there can be no rightful conviction.* There was not sufficient evidence to support the material allegations of the indictment, and defendant's motion for a new trial should have been sustained."

This presumption, as applied to a regular physician, was recognized in *State v. Rowley*, 198 Iowa 613, where we refused to recognize such presumption in favor of one who was not a regular physician. With this rule of burden of proof before us, we turn to the evidence pertaining to the specific issue now under consideration. The prosecutrix testified as follows:

"It did not take him long to make an examination. I don't know what he did. Harold Dunklebarger was present, standing at the foot of the bed, with a electric light bulb which was lit, attached to a cord. Dr. Wallace asked no other question except how I felt. Dr. Wallace then went to the kitchen. Came back over to me. He opened my legs, and introduced an instrument. He left it inserted 10 or 15 minutes. He moved the instrument. I could feel it. Then removed the instrument. Didn't do anything else, that I remember. * * * Got back to Jaeger's home about 9 o'clock. I didn't go to bed immediately, but went about 9:30. Got up next morning, and helped with the washing Monday. Nothing said about what happened. I just helped with the washing. Got to bed about 9 o'clock Monday night; had no pain; had some loss of blood Tuesday morning about 6 o'clock. That was the first time I noticed any pain, all over the lower part of my abdomen, and terrible backache. Lasted until from 3 o'clock until 8 o'clock. * * * I had terrible pain and vomiting from 8 o'clock Tuesday morning, January 12th, and headache. I passed something from the vagina;

passed blood, enough to soak the bed. Q. What happened after 8 o'clock,—did your pain still continue? A. No, I began to feel better. I stayed in bed that morning. Stayed in bed all that day and night, and the next morning until about 11 o'clock, I got up.''

Dr. Wallace testified as follows:

''At the time Julius Jaeger and Harold Dunklebarger came to my house, sometime in December, they told me that Grace Gately was very nervous, and they were afraid she might do some damage to herself,—that she had threatened to kill herself, and that they had to watch her all the time; and they wanted to know if I could give her some medicine that would quiet her down. They said they thought she was pregnant. They told me that she had headaches and pains, and was very nervous. Said she complained of pains. I prescribed a sedative, to quiet her nerves, and also gave cathartic pills, to empty the bowels and regulate them, and to keep the bowels open. There was positively nothing in the prescription I gave to Mrs. Jaeger and to Mr. Dunklebarger for Grace Gately that would cause a miscarriage or abortion. It would have no such effect. * * * We arranged for her to go to Mr. Dunklebarger's apartment, over the Lockwood & Pirwitz furniture store. I went there. When I got there, they were there with the girl. I made an examination of Grace Gately there. I examined her with my speculum, and opened up the vagina, to see the condition of the womb. I found her in a highly nervous condition. That was her general appearance. Q. Tell the jury just what condition you found there when you made your examination. A. There was a dark discharge and oozing discharge from the womb; a bloody discharge, with a very bad odor,—a kind of putrid odor, —bad smell. The external parts were somewhat inflamed. Some inflammation of the privates and the womb, and the womb commencing to dilate. I could introduce the point of my finger into the womb, and it was very much inflamed. Looked as though it had been bruised,—that was the appearance. And the vagina was inflamed, also. I could tell from the examination that I made that the girl was pregnant at that time. * * * Well, I had to use my speculum, to see the condition the womb was in, and when I saw that, I then proceeded to straighten it out. I

straightened up the womb, so the foetus could come away as soon as it might do so; and as there was no life in the foetus, you have to facilitate the miscarriage. It would help her, and I know positively there had to be a miscarriage. The foetus was dead, and if I didn't produce a miscarriage, it might produce death, the condition she was in, at that time, by producing blood poisoning; and I knew that, if I straightened up the womb, it would come away all right, and stop blood poisoning, and if I didn't, it would produce blood poisoning, and thereby she would lose her life,—probably would. The condition in which I found the womb would retard labor, by the womb being turned back the way it stood, and it would take longer for it to come away, and be more dangerous. Q. Now state just exactly what you did, to change the situation as you found it. A. Well, I took hold of the mouth of the womb with the forceps,—just a small pair of these dressing forceps. I didn't have my case with me, but I had my speculum and a small pair of dressing forceps; and I took hold of the mouth of the womb, withdrew the speculum, and then took my two fingers and straightened up the womb. * * * Q. You may state whether or not, basing your opinion upon the condition that you found this girl in, if the treatment and adjustment you gave her there was necessary for the protection of her health and life. A. Positively, beyond any doubt. * * * Q. State whether or not the treatment and adjustment you gave Grace Gately at the Wallace apartment, if she had been in a normal pregnant condition, with a live foetus in her body, would even have had a tendency to cause an abortion or miscarriage. A. No, sir, it would not.''

In rebuttal, the State produced two physicians. The following from their evidence will indicate its character.

Dr. Chalmers testified:

''Q. From the fact that a woman is discharging creamy greenish matter, can you determine whether or not she was carrying a dead fetus? A. No, I couldn't. Q. If you learned also that, a short time later, she was passing black, bloody, putrid matter, would you expect she was carrying a dead fetus? A. I would suspect it. Q. You would suspect it would be? A. Yes. Q. You may state whether or not you would expect, or whether

—or it would tend to produce a miscarriage if you, as a doctor, injected your finger into the vagina of a pregnant woman? A. I don't think so. Q. Is it a matter of good practice to insert a doctor's finger into the vagina of a pregnant woman? A. It might be necessary at some time. The injection of an instrument into the uterus of a pregnant woman would have a tendency to produce a miscarriage. I have straightened up wombs in women in my practice, but not for pregnant women."

Dr. Crowley testified:

."I have straightened up the womb of women at different times, and have done so with a girl about fifteen years of age. Q. When she was about four months along? A. Well, sir, that is about the limit. I have also done that with a pregnant woman, quick with child, very few times, perhaps two or three. I used my gloved hand for that purpose. Such procedure might aid a woman who was carrying a dead fetus. The womb may be in such position that it would be difficult to evacuate, where manipulation might facilitate it very much; and this is true if the fetus was dead. Q. Could you tell by examining the private parts by the use of a speculum and an electric light—tell whether or not the fetus of a pregnant woman was still? A. You might, and might not. It depends on what you find. Miscarriages are at times produced by apparently very slight causes, while in other cases they may experience considerable violence, without apparent injury. It is very difficult to tell what will cause the death of a fetus. In many cases, it is difficult to tell what causes the condition of a patient. In some cases, slight injury produces the death of the fetus. I think that is probably due to the condition of the woman, or other causes that we don't know. In making an examination of a patient, either in obstetrical cases or other cases, we are required to deal with conditions as we find them. If I found the fetus dead in a pregnant woman, I would do something to aid its passage. Falling of the womb or other displacement might obstruct its passage and removal. What is to be done depends upon the character of the displacement. The examination of the patient determines whether or not artificial means should be used for the removal of the dead fetus, and I would be governed wholly by the conditions found in any particular case;

and what might be necessary in one particular case might not be desirable in another. To determine what to do is a part of our professional business. We gain that knowledge from studying at college and from practical experience. I ought to be better able to determine what to do now, than when I begun to practice, and sometime feel that I am. I feel that I have learned considerable by experience. Experience is necessary in the medical profession, and that fact is more largely recognized than ever before. I probably rely as much upon the experience for my source of information as from any other source. It would be necessary to examine the patient, to see whether or not there was an obstruction; and if there was an obstruction of any kind, I would attempt to assist nature in relieving the patient from the fetus; and I could not determine in advance what to do, until after I had examined the patient."

The foregoing excerpts are a sufficient indication of the character of all the material evidence in the record.

It will be noted that the foregoing medical testimony introduced by the State presents no material contradiction to that of Dr. Wallace. On the contrary, it furnishes substantial corroboration thereof.

The only evidence in the record upon which the State must necessarily rely to negative the state of facts testified to by Dr. Wallace is the testimony of the prosecutrix herself. This was to the effect that she felt well at all times prior to the visit to Dr. Wallace; that she had virtually no pain or discomfort; that she was neither nervous nor worried over her condition; that, some six days before the examination by Dr. Wallace, she had felt life in the fetus. She denied, also, that she had ever resorted to any means for producing a miscarriage, or that she had used any instruments, or that she had endangered herself by jumping at any time.

We held, in the *Aiken* case, supra, that the diagnosis of a regular physician may not be negatived by that kind of testimony. If the diagnosis of a regular physician discloses an internal condition of a patient which threatens his life, it may not be negatived by the mere fact that the patient is unconscious of it, and feels well, and is apparently well. Fatal conditions are often found in patients who were wholly unsuspecting of their danger. If, at the time of the examination of Dr. Wallace,

the fetus was dead, then danger to life was necessarily present, even though the patient had not yet felt any discomfort therefrom. The method of development of the danger would be blood poisoning. It might develop to a fatal stage before the patient would become aware; or it might not develop at all to the fatal stage. The condition would be deemed dangerous to life, nevertheless. In order to justify the act of Dr. Wallace, it was not essential that the peril to life should be imminent. It was enough that it be potentially present, even though its full development might be delayed, to a greater or less extent. Nor was it essential that the doctor should believe that the death of the patient would be otherwise *certain*, in order to justify him in affording present relief.

The testimony of the prosecutrix to the effect that she used no means to relieve herself, and that she had done nothing which could have caused the death of the fetus, would have made a jury question on those matters, if they had been controlling. But they were not. If the fetus was dead, as disclosed by the diagnosis, that fact became a controlling one; and this was equally so whether the result was brought about by acts of the prosecutrix or by natural or other causes.

It must be said, therefore, that the State has introduced no evidence to disprove the good faith of the doctor in his diagnosis, or to disprove the diagnosis itself. This being so, what is its effect upon the question of guilt of the defendant? The substance of the evidence against him is that he aided and abetted the doctor. If the doctor was committing a crime, then the defendant might be deemed to be aiding and abetting one. If the doctor was not committing crime, neither was the defendant aiding and abetting one. Indeed, at this point, the district court instructed that the State must prove the criminality of the doctor, in order to sustain its case against the defendant. This is not saying that the defendant would necessarily be deemed guilty, if the doctor was guilty. But upon this record, there can be no occasion for differentiation of the evidence bearing upon the two issues. It is enough that the innocence of the doctor conclusively negatives the guilt of the defendant upon this charge.

We reach the conclusion that the verdict of guilty was not

sustained by the evidence, and that the defendant's motion for a new trial should have been sustained on that ground.

The judgment of conviction is, accordingly,—*Reversed.*

STEVENS, C. J., and FAVILLE, KINDIG, and WAGNER, JJ., concur.