Argued March 30, affirmed November 23, petition for
rehearing denied December 21, 1955

## STATE OF OREGON *v.* ELLIOTT
289 P. 2d 1075

*Leo Levenson,* Portland, argued the cause and filed a brief for appellant.

*Horace B. Fenton,* deputy district attorney for Multnomah County, Portland, argued the cause for respondent. On the brief were John B. McCourt, district attorney for Multnomah County, Charles E. Raymond and James J. Kennedy, deputy district attorneys for Multnomah County, Portland.

LUSK, J.

The defendant, Dr. Ross H. Elliott, a chiropractor, was convicted of the crime of an attempt to commit manslaughter by abortion and has appealed. The indictment charged the crime of manslaughter by abortion committed as follows:

"The said Dr. ROSS H. ELLIOTT, and JANE DOE, whose true name is unknown on the 1st day of December, A. D. 1948, in the County of Multnomah and State of Oregon, then and there being, did then and there unlawfully, feloniously, wilfully and purposely, administer to and cause to be taken by one Rose Marie Brown, certain dangerous and poisonous drugs and medicines, the names and more particular description of which said drugs and medicines are to the Grand Jury unknown, and use and employ in and upon the body and womb of her, the said Rose Marie Brown, certain instruments a more particular description of which said instruments is to the Grand Jury unknown, she, the said Rose Marie Brown, being then and there a woman pregnant with child, with intent then and there on the part of them, the said Dr.

Ross H. Elliott and Jane Doe, whose true name is unknown, thereby to destroy said child, it not being then and there necessary in order to preserve the life of her, the said Rose Marie Brown, the mother of said child, to so administer said drugs or medicines or so use or employ said instruments or to destroy said child, and did then and there by means of such dangerous, poisonous drugs and medicines so administer to her, the said Rose Marie Brown, in the manner aforesaid, and by means of said instruments so used and employed in and upon the body and womb of her, the said Rose Marie Brown, in the manner aforesaid, inflict upon the said child within the body and womb of said Rose Marie Brown, certain mortal wounds, bruises, lacerations and mortal sickness, and did thereby and in the manner and by the means aforesaid cause and produce the death of the said child''.

At the conclusion of the testimony the defendant moved for a directed verdict of acquittal on the ground that the state had failed to prove all the essential elements of the crime charged, or of any lesser and included crime. The state thereupon conceded that it had failed to prove that the defendant caused the death of a child, and abandoned the charge of manslaughter by abortion but contended that the evidence showed an attempt to commit that crime. The court denied the motion for a directed verdict, and submitted to the jury the issue of attempt. The ruling is the basis of defendant's first assignment of error.

The evidence is very clear that Rose Marie Brown on December 1, 1948, at the time an unmarried woman, thinking herself pregnant, went to the office of the defendant for the purpose of procuring an abortion; that the defendant, after examining her, told her there were signs of pregnancy, and agreed to perform an abortion for $100.00, which she paid him the next day,

December 2. On that day, and again on December 3 and December 4, the defendant, by the use of an instrument which he inserted in the womb of Rose Marie Brown, attempted to remove a fetus which he supposed to be there. The fact was that the prosecutrix was pregnant, but the pregnancy was not in the womb but in the Fallopian tube—an ectopic pregnancy, as it is frequently called. This fact was discovered when Rose Marie Brown, being acutely ill, was taken to a hospital on December 27, 1948. Dr. Ernest A. Movius operated by making an incision in her abdomen, and a tubal pregnancy in the right tube was removed.

In addition to the foregoing, the evidence would justify findings to the following effect: that a tubal pregnancy, when it can be diagnosed, should be terminated for the sake of the mother, but it is not usually diagnosed prior to rupture of the tube; that it is possible for a tubal pregnancy to rupture and carry on as an abdominal pregnancy all the way to term and for the child to be delivered by a Caesarean section with the result of a live mother and a live child; that there may be a pregnancy in the uterus and in the tube at the same time, and products of conception may be found in the uterus even though the pregnancy is in the tube; that scraping of the uterus would not remove a tubal pregnancy.

Under this evidence it is the contention of the defendant that the circuit court erred in denying his motion for a directed verdict because, as it is asserted (1) "No crime is committed if the act attempted or consummated was necessary to preserve the life of the woman. Therefore, proof by the state of the existence of an ectopic or tubal pregnancy which endangered life and required surgery, justifies a dismissal of the case for failure of proof of the corpus delicti." (2) "There

can be no conviction for an attempt to violate a statute unless the state proves all the essential elements of the substantive crime. In this case the state failed to prove the corpus delicti by its failure to prove that the woman was pregnant with a child in the uterus.''

The statute under which the indictment was brought was OCLA 23-408, now ORS 163.060, and is as follows:

"If any person shall administer to any woman pregnant with a child any medicine, drug, or substance whatever, or shall use or employ any instrument or other means, with intent thereby to destroy such child, unless the same shall be necessary to preserve the life of such mother, such person shall, in case the death of such child or mother be thereby produced, be deemed guilty of manslaughter."

■■ (1) A conviction of the substantive offense thus defined could not stand if there were no proof of the negative element, ''unless the same shall be necessary to preserve the life of such mother''. ''The same'' in this case refers to the use of an instrument by the defendant for the purpose of removing a fetus (as we shall call the product of conception) from the womb. There is inconsistency in the testimony of the two medical witnesses who testified for the state as to whether on December 2, 1948, removal of the fetus from the tube was necessary to preserve the life of the prosecutrix, although it is certain that that necessity arose later. The defendant introduced no evidence. If it be assumed that on December 2, 1948, removal of the fetus from the tube was necessary to preserve the life of the mother, and that, if the defendant on that day had either attempted or accomplished such an operation he would for that reason have had a complete defense to a prosecution for such an act, it by no means follows that the same thing is true of the case which is actually here for decision, for the curet-

ting of the womb could not remove a fetus in the tube, and, while that act of the defendant's might have endangered, it certainly had no tendency to preserve, the life of the prosecutrix. At least, the jury could have so found.

▮ Even had there been a normal pregnancy which the defendant had actually terminated or attempted to terminate, the proof would have been sufficient to support the jury's verdict on this issue. It was shown by uncontradicted evidence that on December 2, 1948, the prosecutrix was in very good health, and such evidence, in view of the presumption "that a pregnant woman would give birth to a child naturally and survive afterwards," was, as we held in *State v. Ausplund*, 86 Or 121, 127, 167 P 1019, sufficient to take the case to the jury on this point. The decisions cited by the defendant are not in conflict with this holding: *State v. Dunklebarger*, 206 Ia 971, 221 NW 592; *State v. Shoemaker*, 157 Ia 176, 138 NW 381; *State v. Aiken*, 109 Ia 643, 80 NW 1073. It is true that in the Dunklebarger case the court held that testimony of the prosecutrix that she was in good health was not sufficient to sustain the state's burden of proof. But there the doctor who performed the operation, and who was not the defendant, testified as to his diagnosis and that the operation was necessary to preserve the life of the prosecutrix, and the Iowa court held that the diagnosis of a regular physician could not be negatived by the kind of testimony given by the prosecutrix. There is no evidence in this case to overcome the prima facie showing made by the state.

(2) The defendant's contention that the evidence is insufficient because the state failed to prove one of the elements of the crime of manslaughter by abortion, to-wit, that the prosecutrix was pregnant with child

in the womb, requires a consideration of the law of criminal attempts.

As a part of this contention the defendant argues that a tubular pregnancy is not comprehended by the words of the statute "pregnant with a child." Language in the opinion in *State v. Atwood,* 54 Or 526, 531, 102 P 295, 104 P 195, is relied on. But it should be remembered that in no case dealing with criminal abortion has this court been faced with the problem of any other than a normal pregnancy. It is not improbable, indeed, that Blackstone, whose reference to an infant "in its mother's womb" (1 Blackstone, Commentaries (Lewis' ed) 118) was quoted in the Atwood case, knew nothing of a tubal pregnancy. Chapter 556 (g), Or Laws 1953, cited by the defendant, which relates to the revocation of a chiropractor's license and in which an abortion is said "to mean the removal from the womb of a woman the product of conception at any time prior to the delivery of the child", is, of course, without application to an act that occurred in 1948. We may, however, put all this to one side and treat the case as though the statute refers only to a pregnancy in the womb.

We are brought to the statutory definition of a criminal attempt. ORS 161.090 provides:

"Any person who attempts to commit a crime, and in the attempt does any act towards the commission of the crime but fails or is prevented or intercepted in the perpetration thereof, shall be punished * * *."

The leading case applying this statute is *State v. Taylor,* 47 Or 455, 84 P 82, 4 LRA (ns) 417. The defendant was convicted of an attempt to commit arson by burning the barn and wheat of one Bannister. He

employed McGrath and Palmer to do the burning, and agreed to pay them $100.00. Palmer informed his employer of the plan, and the latter, who was a friend of Bannister, advised Palmer to pretend to go through with it. On the night that the crime was to be accomplished Taylor met with McGrath and Palmer, produced a pair of overalls and showed them how to use them in starting a slow-burning fire, paid $100.00 to McGrath, and turned over to them his own horse with the overalls tied to the saddle. McGrath and Palmer started towards the Bannister place, but, along the way, they noticed fresh tracks in the road and, as they neared the place, observed two or three buggies in the barnyard, which frightened McGrath, who was afraid to go on with the enterprise for fear they were being watched, and so it was abandoned. In the opinion, written by Mr. Justice ROBERT S. BEAN, it was said:

"* * * An indictable attempt, therefore, consists of two important elements: First, an intent to commit the crime; and, second, a direct, ineffectual act done towards its commission."

The judgment of conviction was affirmed, the court saying that the defendant "had thus done all that he was expected to do, and his felonious design and action was then just as complete as if the crime had been consummated, and the punishment of such an offender is just as essential to the safety of society. The failure to commit the crime was not due to any act of his, but to the insufficiency of the agencies employed for carrying out his criminal design."

■ In this case there is ample evidence of a criminal intent and of an overt act designed to carry out that intent. The failure to consummate the crime was not due to the insufficiency of the agencies employed as

in the Taylor case, but the defendant failed "in the perpetration of the crime" because the fetus—the child—was not where he supposed it to be. Thus, what he attempted was impossible, and the question is whether it was for that reason any the less a criminal attempt. We think not. There is a strong analogy in the so-called "empty-pocket" cases. It is held by a persuasive weight of authority in this country that a person who puts his hand in the pocket of another with the intention of stealing the contents, but fails of his purpose because the pocket is empty, is guilty of attempted larceny. *People v. Moran,* 123 NY 254, 25 NE 412, 20 Am St Rep 732, 10 LRA 109; *Commonwealth v. McDonald,* 59 Mass 365; *State v. Wilson,* 30 Conn 500; *People v. Jones,* 46 Mich 441, 9NW 486; See, also, *Rogers v. Commonwealth,* 5 Serg & Rawle 463; *State v. Beal,* 37 Oh St 108, 41 Am Rep 490; 1 Burdick, The Law of Crime 192, § 146.

In *State v. Wilson* the Connecticut court, answering contentions of the defendant, said:

"* * * But it is not true that the thing intended to be taken must be where the attempting thief supposes it to be, or that there must be in fact property where he supposes there is. It is sufficient if he supposes there is property in the pocket, trunk, or other receptacle, and attempts, by some act adapted to the purpose, to obtain it feloniously." 30 Conn 505.

Again it was said:

"* * * the only safe rule is, that the attempt is complete and punishable, when an act is done with intent to commit the crime, which is adapted to the perpetration of it, whether the purpose fails by reason of interruption, or because there was nothing in the pocket, or for other extrinsic cause." 30 Conn 506.

In *Clark v. State,* 86 Tenn 511, 8 SW 145, a conviction of attempt to commit a larceny was sustained where the proof was that the accused opened the cash drawer in a store with intent to steal the contents but was detected by the proprietor before he could accomplish his purpose. It was left in doubt whether there was any money in the cash drawer or not, but the court held this immaterial on the question of a criminal attempt.

In *People v. Lee Kong,* 95 Cal 666, 30 P 800, the defendant, operator of a gambling hall, became aware that a policeman had bored a hole in the roof for the purpose of watching the premises. Supposing that the policeman was behind the hole, he fired his pistol at the hole, but the policeman was at that moment stationed in a different place and escaped injury. The court held that two elements were necessary: an unlawful attempt and present ability to inflict the injury. It was held that there was an unlawful attempt. The defendant's shot was directed at the place where it was believed that the substantive crime would probably be committed through the instrumentality of his act.

In *State v. Mitchell,* 170 Mo 633, 71 SW 175, the defendant, believing his victim was sleeping in a bed in a downstairs room, fired into the bed, one bullet hitting the pillow and another the dresser close by. In fact the victim, unknown to the defendant, had gone to bed in an upstairs room. Since the defendant had been a boarder in the other's house and knew that the latter customarily slept in the downstairs bedroom, the defendant's expectation that his act would result in the desired killing was deemed an eminently reasonable one, and the court therefore convicted him,

holding that his conduct "made out a perfect case of an attempt."

Citing this case, Professor Sayre, in his illuminating article, "Criminal Attempts," 41 Harv L Rev 821, 851, says:

"The decisions make it clear that, as has been suggested, one can be convicted even though because of his mistake his efforts could not under the existing circumstances possibly cause the desired criminal consequence."

A distinction must be kept in mind between the case at bar and cases arising under statutes of a different character, but which are sometimes discussed under the head of attempted crimes. Under the latter an attempt to procure an abortion is the offense itself (1 CJS 320, Abortion § 10), whereas here the statute makes punishable an attempt to commit a crime defined by another statute. An early English case, *Rex. v. Scudder*, 1 Moody C C 216 (1828), 3 Car & P 605, furnishes an illustration. The indictment charged that the defendant administered a drug to one Susan Clouder "with intent thereby to cause and procure the miscarriage of the said Susan Clouder, she at the time of administering and taking said drug being with child." A conviction of the defendant was held wrong on the ground that the statute did not apply when it appeared that the woman was not with child.

Similar cases are *People v. Richardson,* 161 Cal 552, 120 P 20; *Commonwealth v. Parker,* 50 Mass (9 Met) 263.

If, however, the statute provides for the punishment of acts done with intent to procure the miscarriage of any woman, not mentioning whether she must be with child or not, then the fact that the woman

was not pregnant is immaterial. *Commonwealth v. Taylor,* 132 Mass 261; *Eggart v. State,* 40 Fla 527, 25 So 144; *State v. Snyder,* 188 Ia 1150, 177 NW 77, 10 ALR 309; *State v. Rogers,* 135 Mo App 695, 116 SW 469. See cases cited in annotation, 10 ALR 314.

Also to be distinguished are cases such as *State v. Cooper,* 22 NJL 52, cited by the defendant, where it was held that the procuring of an abortion by the mother or another with her assent, unless the mother is quick with child, is not an indictable offense at the common law and consequently that the mere attempt to commit the act is not indictable. The opinion recognizes the common-law rule that life commences at the the moment of quickening, not before, a distinction abolished by our statute (see *State v. Ausplund,* 86 Or 121, 132, 167 P 1019). The act which the defendant in this case attempted to commit is a crime under the statute.

*People v. Jaffe,* 185 NY 497, 78 NE 169, 9 LRA (ns) 263, also cited by the defendant, is decided upon the same principle as the Cooper case, and was distinguished from the pickpocket cases by the court because "the act, which it was doubtless the intent of the defendant to commit, would not have been a crime if it had been consummated." 185 NY 497. The indictment there was for receiving stolen goods, knowing them to have been stolen, and the defendant was convicted of an attempt to commit the crime charged in the indictment. The evidence showed that at the time the goods were received by the defendant they were not stolen goods, and the court held that, as there can be no receiving of stolen goods which had not been stolen, there could be no attempt to receive stolen goods knowing them to have been stolen when they had not been stolen in fact. There was a strong dis-

sent in that case which relied on *People v. Gardner,*
144 NY 119, 38 NE 1003, 28 LRA 699, 43 Am St Rep
741. In the latter case the court sustained a conviction
for an attempt to commit extortion. An essential
element of the crime of extortion in New York is that
the victim part with the money under the influence
of fear, but the prosecutrix in that case was in fact
a decoy of the police and was not put in fear by the
defendant. The New York Court of Appeals said:
"This crime as defined in the statute depends upon
the mind and intent of the wrongdoer, and not on the
effect or result upon the person sought to be coerced."
144 NY 124. See *Commonwealth v. Johnson,* 312 Pa.
140, 167 A 344, 89 ALR 333. It is difficult to reconcile
the New York decisions, but in any event the Jaffe
case is not persuasive here for reasons which the New
York court itself pointed out.

We are not dealing with a case similar to those
listed in 1 Burdick, The Law of Crime 189, § 144,
under the head of "Physical Impossibility to Commit."
Of this sort are cases holding that a boy under the
age of 14, who is conclusively proved to be physically
incapable of committing rape, is also incapable of the
attempt. See *McKinney v. State,* 29 Fla 565, 10 So
732; *State v. Sam,* 60 NC 293; *Foster v. Commonwealth,*
96 Va 306, 31 SE 503; *Reg. v. Phillips,* 8 Car & P 736.
Nor can it be said that the act done by the defendant,
and which was expected and intended to accomplish
the crime, was one which, in the language of Mr.
Justice Holmes, was not "near enough to the result
to constitute an attempt to commit it, as in the classic
instance of shooting at a post supposed to be a man."
*Commonwealth v. Kennedy,* 170 Mass 18, 20. As stated
in that case, "Usually acts which are expected to bring
about the end without further interference on the part

of the criminal are near enough, unless the expectation is very absurd." See *State v. Taylor,* supra, 47 Or at 458.

This case falls squarely within the description of an indictable attempt given in 1 Bishop, Criminal Law (9th ed) 535, § 752:

> "Where the non-consummation of the intended criminal result is caused by an obstruction in the way, or by the want of the thing to be operated upon, if such impediment is of a nature to be unknown to the offender, who used what seemed appropriate means, the punishable attempt is committed."

See, also *Commonwealth v. Jacobs,* 91 Mass (9 Allen) 274, 275.

In *People v. Fiegelman,* 33 Cal App 2d 100, 91 P2d 156, the defendant attempted to steal from a man's left hip pocket, which was empty. The victim's money was in his front pocket. The defendant was convicted of attempted grand theft, and the conviction was affirmed on appeal. The defendant in the present case made a similar mistake in his attempt to commit the crime of manslaughter by abortion and for similar reasons failed of his purpose. The "want of the thing to be operated upon" is no defense to the charge of a criminal attempt to commit the substantive offense. And "the punishment of such an offender is just as essential to the safety of society" as though the crime had been consummated. *State v. Taylor,* supra, 47 Or at 459.

The circuit court did not err in denying the motion for a directed verdict.

The second and final assignment of error is based upon a ruling of the court which sustained an objection

by the state to the following question put to the prosecutrix on cross-examination:

"Mrs. Brown, didn't you tell us, in the course of your conversation with us over at your home, that you had told the Grand Jury a falsehood when you testified before the Grand Jury, that you had referred your sister-in-law to Dr. Elliott?"

The conversation referred to took place in the home of the prosecutrix several weeks before the trial, when the defendant and two of his attorneys called on her. The prosecutrix was cross-examined at considerable length concerning statements made by her during the interview. She was asked if she had intentionally told a falsehood to the grand jury or the district attorney and answered in the negative. She was then asked whether she had told the grand jury that she had referred her sister-in-law to Dr. Elliott. The witness answered that she could not remember, and, after a colloquy between court and counsel, the question above set forth was put and the objection to it sustained.

There was no reversible error in the ruling. The question did not relate to the witness' direct examination, nor to the issue of the defendant's guilt or innocence, but to a wholly collateral matter. Had the witness denied that she had falsified in the particular suggested by the question, the defendant would not have been permitted to contradict her.

"* * * It is a general principle that a witness cannot be cross-examined as to collateral or irrelevant matters, merely for the purpose of contradicting him by other evidence, if he should deny it, in order thereby to discredit his testimony; and where a witness is interrogated for the purpose of impeachment as to a matter not relevant to the issue and not touched on in direct examination, his

answer is, as a general rule, binding on the party cross-examining him.'' *Peters v. Consolidated Freight Lines,* 157 Or 605, 610, 73 P2d 713.

■ If it be said that the evidence may have had some bearing on the prosecutrix's credibility, on a question of that sort the trial judge has a considerable discretion with which this court will not lightly interfere. *Bowles v. Creason,* 156 Or 278, 290, 66 P2d 1183; *Richer v. Burke,* 147 Or 465, 476, 34 P2d 317. We see nothing in the circumstances of this case which would warrant us in disturbing the ruling. The cases cited by the defendant in which witnesses were permitted to be impeached with evidence of contradictory statements made by them to the grand jury involved testimony directly bearing on the guilt or innocence of the defendant and are, therefore, not in point. See *State v. Brown,* 28 Or 147, 41 P 1042; *State v. McDaniel,* 39 Or 161, 65 P 520.

We find no error in the record and the judgment is affirmed.

Mr. Justice BRAND did not participate in the foregoing decision.