[Crim. 12739.   In Bank.   Sept. 5, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. LEON PHILLIP BELOUS, Defendant and Appellant.

956

A. L. Wirin, Fred Okrand, Zad Leavy and Beilenson & Leavy for Defendant and Appellant.

McCutchen, Doyle, Brown & Enersen, Burnham Enersen, Robert A. Blum, Terry J. Houlihan, Norma G. Zarky, Howard H. Jewel, Paul N. Halvonik, William Kelly; Barbara N. Armstrong, Charles E. Beardsley, George A. Blackstone, A. Stevens Halsted, Jr., Roderick M. Hills, Leonard S. Janofsky, Herma Hill Kay, Frederick R. McBrien, Charles T. Munger, Stuart T. Peeler, Samuel O. Pruitt, Jr., Charles E. Rickershauser, Jr., Graham L. Sterling, Charles E. Stimson, Jr., and Francis. M. Wheat as Amici Curiae on behalf of Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Phillip G. Samovar, Deputy Attorney General, for Plaintiff and Respondent.

Charles H. Clifford, Walter R. Trinkaus, J. J. Brandlin, Thomas J. Arata, Richard D. Andrews, Cyril A. Coyle, Mazzera, Snyder & De Martini, John F. Duff, William R. Kennedy,

Richard G. Logan and Curran, Golden, McDevitt & Martin as Amici Curiae on behalf of Plaintiff and Respondent.

PETERS, J.—Dr. Leon Phillip Belous was convicted in January 1967, after a jury trial, of abortion, in violation of section 274 of the Penal Code, and conspiracy to commit an abortion, in violation of section 182 of the Penal Code, both felonies. The court suspended proceedings, imposed a fine of $5,000, and placed Dr. Belous on probation for two years. He appeals from the order granting probation.

Dr. Belous is a physician and surgeon, licensed since 1931 to practice medicine in the State of California, and specializing in obstetrics and gynecology. He has been on the attending staff of the gynecology department of Cedars of Lebanon Hospital in Los Angeles since 1931, is a fellow of the Los Angeles Gynecology and Obstetrical Society, the American College of Obstetrics and Gynecology, and the Abdominal Surgical Society, and the Geriatric Society, and a member of the American Board of Obstetrics and Gynecology. He is on the Board of Directors of the California Committee on Therapeutic Abortion, an organization which seeks to liberalize abortion laws. He is considered by his associates to be an eminent physician in his field.

The prosecution's witnesses, a young woman and her husband, Cheryl and Clifton, testified to the following:

In 1966, Cheryl, then unmarried, believed she was pregnant. A family physician had given her pills which would induce menstruation if she were not pregnant, but the pills did not work. She and Clifton had sometime earlier seen Dr. Belous on television, advocating a change in the California abortion laws. They had never heard of Dr. Belous before. Clifton obtained the doctor's phone number from the television station and phoned Dr. Belous; he explained the problem and that they both were "pretty disturbed," and at their "wits' end" and asked for Dr. Belous' help. Dr. Belous told him there was nothing he could do, but Clifton "continued pleading," and threatened that Cheryl would go to Tijuana for an abortion. Finally the doctor agreed to see them at his office.

Dr. Belous examined Cheryl at his Beverly Hills office and confirmed that she was possibly pregnant. Cheryl was otherwise in good health. The visit lasted about 45 minutes and was very emotional. Both Clifton and Cheryl pleaded for help, cried, insisted they were going to have an abortion "one way

or another.'' The doctor lectured them on the dangers of criminal abortions, and Tijuana abortions in particular, and suggested that they get married. He insisted he did not perform abortions. He refused to recommend anyone in Tijuana. Finally, in response to their pleadings, Dr. Belous gave them a piece of paper with a Chula Vista phone number. He told them an abortion would cost about $500. He gave Cheryl a prescription for some antibiotics and instructed her to return for an examination.

Dr. Belous testified that he was very familiar with the abortion business in Tijuana. He had visited the clinics there to learn about conditions and knew that women who went to Tijuana were taking their lives in their hands. He met Karl Lairtus while in Tijuana and knew from personal observation that Lairtus, licensed to practice in Mexico but not in California, was performing skilled and safe abortions in Mexico. Lairtus wanted to obtain a California license, and sought out Belous' help on a number of occasions. When Lairtus moved from Mexico to Chula Vista, he gave Dr. Belous his address and phone number. When Lairtus moved to Los Angeles, he gave the doctor a Hollywood address, and made it known to the doctor that he was performing abortions. It was Lairtus' number that Belous gave to Cheryl and Clifton. Although he had given out Lairtus' number before, in similar situations, where distraught pregnant women insisted they would do anything, Dr. Belous had no idea how many women actually went to Lairtus.

Cheryl and Clifton made arrangements with Lairtus, and went to the address which Lairtus gave them on the phone. After the abortion was performed, while Cheryl was resting, the police, having been advised by another woman that Lairtus was performing abortions at that address, came to his apartment, followed another couple into the apartment and arrested Lairtus. They found two notebooks, containing women's names, ages, dates of last menstruation, and physician's names, including Dr. Belous' name, which the police interpreted as the referring doctor with whom Lairtus was to split his fees. On the basis of this information, Dr. Belous was arrested at his office. Lairtus pleaded guilty. At Dr. Belous' trial, he testified that, although not solicited, he sent Dr. Belous about $100 as a professional courtesy in about half the cases that he had performed abortions on Dr. Belous' patients. Dr. Belous denied receiving any money from Lairtus.

The substance of Dr. Belous' defense was that he gave Lairtus' phone number to Cheryl and Clifton only because he believed that they would, in fact, do anything to terminate the pregnancy, which might involve butchery in Tijuana or self-mutilation; that in face of their pleading and tears, he gave out the phone number of someone whom he knew to be a competent doctor, although unlicensed in this state. The doctor believed that if the young couple carried out their threats, Cheryls' very life was in danger.

Section 274 of the Penal Code, when the conduct herein involved occurred, read: "Every person who provides, supplies, or administers to any woman, or procures any woman to take any medicine, drug, or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life, is punishable by imprisonment in the State prison not less than two nor more than five years."

The statute was substantially unchanged since it was originally enacted in 1850.[1] In 1967, the statute was amended and sections 25950 through 25954 ("Therapeutic Abortion Act") added to the Health and Safety Code. The act extends the lawful grounds for obtaining an abortion.[2] Section 274 is directed towards the abortionist. Under section 275 of the

---

[1]Stats. 1850, ch. 99, § 45, at p. 233: "[E]very person who shall administer or cause to be administered or taken, any medicinal substances, or shall use or cause to be used any instruments whatever, with the intention to procure the miscarriage of any woman then being with child, and shall be thereof duly convicted, shall be punished by imprisonment in the State Prison for a term not less than two years, nor more than five years: *Provided,* that no physician shall be affected by the last clause of this section, who, in the discharge of his professional duties, deems it necessary to produce the miscarriage of any woman in order to save her life."

[2]Penal Code, section 274, as amended reads: "Every person who provides, supplies, or administers to any woman, or procures any woman to take any medicine, drug, or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, *except as provided in the Therapeutic Abortion Act . . . of the Health and Safety Code,* is punishable by imprisonment in the state prison . . . ." (Stats. 1967, ch. 327, § 3, at p. 1523; italics added.)
The Therapeutic Abortion Act (Health & Saf. Code, §§ 25950-25954) authorizes abortions "only" if the abortion takes place in an accredited hospital (§ 25951, subd. (a)); the abortion is approved by a hospital staff committee consisting of at least three licensed physicians and surgeons (§ 25951, subd. (b)); and there is "substantial risk that continuance of the pregnancy would gravely impair the physical or mental health of the mother" (§ 25951, subd. (c)(1)); the pregnancy resulted from rape or incest (§ 25951, subd. (c)(2)); or the woman is under 15 years of age (§ 25952, subd. (c)).

Penal Code (also amended by the Therapeutic Abortion Act) a woman who solicits or submits to an abortion is punishable by up to five years' imprisonment; similarly, under section 276, any person who solicits a woman to submit to an abortion is punishable by up to five years' imprisonment.

We have concluded that the term "necessary to preserve" in section 274 of the Penal Code is not susceptible of a construction that does not violate legislative intent and that is sufficiently certain to satisfy due process requirements without improperly infringing on fundamental constitutional rights.

"The requirement of a reasonable degree of certainty in legislation, especially in the criminal law, is a well established element of the guarantee of due process of law. 'No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids . . . "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." ' (*Lanzetta* v. *New Jersey,* 306 U.S. 451, 453 [83 L.Ed. 888, 890 59 S.Ct. 618]; see also *Connally* v. *General Constr. Co.,* 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126].) Such also is the law of the State of California. (*People* v. *McCaughan,* 49 Cal.2d 409, 414 [317 P.2d 974].)

"The required meaning, certainty and lack of ambiguity may appear on the face of the questioned statute or from any demonstrably established technical or common law meaning of the language in question. (*People* v. *McCaughan, supra,* 49 Cal.2d 409, 414; *Lorenson* v. *Superior Court,* 35 Cal.2d 49, 60 [216 P.2d 859].) " (*In re Newbern,* 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116].) The requirement of certainty in legislation is greater where the criminal statute is a limitation on constitutional rights. (See *Smith* v. *California* (1959) 361 U.S. 147, 151 [4 L.Ed.2d 205, 210, 80 S.Ct. 215].) On the other hand, mathematical certainty is not required; "some matter of degree" is involved in most penal statutes. (*Nash* v. *United States* (1913) 229 U.S. 373, 377 [57 L.Ed. 1232, 1235, 33 S.Ct. 471].)

Dictionary definitions and judicial interpretations fail to provide a clear meaning for the words, "necessary" or "preserve." There is, of course, no standard definition of "necessary to preserve," and taking the words separately, no

ear meaning emerges. "Necessary" is defined as: "1. Esential to a desirable or projected end or condition; not to be dispensed with without loss, damage, inefficiency, or the like; . ." (Webster's New International Dictionary (2d ed.), unabridged.) The courts have recognized that " 'necessary' has not a fixed meaning, but is flexible and relative." (*Westphal* v. *Westphal*, 122 Cal.App. 379, 382 [10 P.2d 119]; see also, *City of Dayton* v. *Borchers* (1967) 13 Ohio Misc. 273 [232 N.E.2d 437, 441]; ["A *necessary* thing may supply a wide range of wants, from mere convenience to logical completeness."].)

The definition of "preserve" is even less enlightening. It is defined as: "1. To keep or save from injury or destruction; to guard or defend from evil; to protect; save. 2. To keep in existence or intact; . . . To save from decomposition, . . . To maintain; to keep up; . . . (Webster's New International Dictionary, *supra*.) The meanings for "preserve" range from the concept of maintaining the status quo—that is, the woman's condition of life at the time of pregnancy—to maintaining the biological or medical definition of "life"—that is, as opposed to the biological or medical definition of death."

Since abortion before quickening was not a crime at common law (Perkins, Criminal Law (1967) 101; Means, *The Law of New York Concerning Abortion and the Status of the Foetus, 1664-1968: A Case of Cessation of Constitutionality* (1968) 14 N.Y.L.F. 411, 419-422; Stern, *Abortion: Reform and the Law* (1968) 59 J.Crim.L.C. & P.S. 84, 85) we cannot rely on common law meanings or common law referents (see *Sorenson* v. *Superior Court, supra,* 35 Cal.2d 49, 60; *People* v. *Agnello*, 259 Cal.App.2d 785, 790-791 [66 Cal.Rptr. 571]).[3]

Various possible meanings of "necessary to preserve . . . life" have been suggested. However, none of the proposed definitions will sustain the statute.

Respondent asserts: "If medical science feels the abortion should be performed as it is necessary to preserve her life, then it may be performed; that is, unless it is performed the patient will die."

Our courts, however, have rejected an interpretation of

[3]Compare *United States* v. *Harriss* (1954) 347 U.S. 612, 634 [98 L.Ed. 989, 1005, 74 S.Ct. 808] (dissenting opinion): "Whoever kidnaps, steals, kills, or commits similar acts of violence upon another is bound to know that he is inviting retribution by society, and many of the statutes which define these long-established crimes are traditionally and perhaps necessarily vague."

"necessary to preserve" which requires certainty or imm
diacy of death. (*People* v. *Abarbanel,* 239 Cal.App.2d 31,
35 [48 Cal.Rptr. 336]; *People* v. *Ballard,* 218 Cal.App.2d 29
298 [32 Cal.Rptr. 233]; *People* v. *Ballard,* 167 Cal.App.
803, 807 [335 P.2d 204].) Justice Fourt, in *People* v. *Ballar*
*supra,* 167 Cal.App.2d 803, 814, stated: "Surely, the aborti
statute (Pen. Code, § 274) does not mean by the words 'unle
the same is necessary to preserve her life' that the peril to li
be imminent. It ought to be enough that the dangerous cond
tion 'be potentially present, even though its full developme
might be delayed to a greater or less extent. Nor was it esse
tial that the doctor should believe that the death of the p
tient would be otherwise *certain* in order to justify him
affording present relief.' [Citations.]" The above langua
was quoted in *People* v. *Abarbanel, supra,* 239 Cal.App.2
31, 34.

In *People* v. *Ballard, supra,* 167 Cal.App.2d 803, 813-81
the evidence established that the woman was "extreme
nervous . . . upset, had headaches, was unable to sleep, an
thought that she was pregnant. She was agitated, disturbe
and had many problems." (Italics omitted.) In *People*
*Ballard, supra,* 218 Cal.App.2d 295, 307, it was establishe
that at the time each of the women went to the defendar
doctor she was in a "bad state of health" because of sel
imposed abortive practices. And in *People* v. *Abarbane*
*supra,* 239 Cal.App.2d 31, the obstetrician performed th
abortion after receiving letters from two psychiatrists to th
effect that abortion was indicated as necessary to save th
woman's life from the "possibility" of suicide. In each o
the cases the conviction was reversed.

If the fact of ill health or the mere "possibility" of suicid
is sufficient to meet the test of "necessary to preserve he
life," it is clear that a showing of immediacy or certainty o
death is not essential for a lawful abortion. Two other juris
dictions have also rejected an interpretation of "necessary t
preserve" which would require certainty or immediacy o
death. (*State* v. *Dunklebarger* (1928) 206 Iowa 971 [221 N.W
592, 596]; *State* v. *Hatch* (1917) 138 Minn. 317 [164 N.W
1017].)

After the decision in *Ballard,* the Legislature did no
amend the statute to repudiate the rule suggested by that cas
and to establish a definition requiring certainty of death.[4]

---

[4] The definitions suggested by the two *Ballard* cases and by *Abarbane*
will be discussed later in this opinion.

It would be anomalous to uphold a criminal statute against charge of vagueness by adopting a construction of the statute rejected by the courts of this state as not reflecting leglave intent unless there was a clear showing of a strong public blicy or legislative intent requiring adoption of the rejected nstruction. No such showing has been made with regard to e construction urged by respondent.

Moreover, a definition requiring certainty of death would ork an invalid abridgment of the woman's constitutional ghts. The rights involved in the instant case are the oman's rights to life and to choose whether to bear chilen.[5] The woman's right to life is involved because childrth involves risks of death.[6]

The fundamental right of the woman to choose whether to ear children follows from the Supreme Court's and this urt's repeated acknowledgment of a "right of privacy" or liberty" in matters related to marriage, family, and sex. (See, e.g., *Griswold* v. *Connecticut, supra,* 381 U.S. 479, 485, 86, 500 [14 L.Ed.2d 510, 515, 516, 524, 85 S.Ct. 1678]; *Loving* v. *Virginia* (1967) 388 U.S. 1, 12 [18 L.Ed.2d 1010, 1018, 87 Ct. 1817] [statute prohibiting interracial marriages, violave of due process clause]; *Skinner* v. *Oklahoma* (1942) 16 U.S. 535, 536, 541 [86 L.Ed. 1655, 1657, 1660, 62 Ct. 1110] [sterilization laws; marriage and procreation volve a "basic liberty"]; *Pierce* v. *Society of Sisters* 1925) 268 U.S. 510, 534-535 [69 L.Ed. 1070, 1077-1078, 45 Ct. 571, 39 A.L.R. 468] [prohibition against nonpublic hools; same]; *Meyer* v. *Nebraska* (1923) 262 U.S. 390, 399-00 [67 L.Ed. 1042, 1045-1046, 43 S.Ct. 625, 29 A.L.R. 1446] prohibition against teaching children German language; ame]; *Perez* v. *Sharp,* 32 Cal.2d 711, 715 [198 P.2d 17]; see lso *Custodio* v. *Bauer,* 251 Cal.App.2d 303, 317-318 [59 Cal. ptr. 463].) That such a right is not enumerated in either the nited States or California Constitutions is no impediment to e existence of the right. (See, e.g., *Carrington* v. *Rash*

[5]Dr. Belous' standing to raise this right is unchallenged. (Cf. *Griswold* *Connecticut* (1965) 381 U.S. 479, 481 [14 L.Ed.2d 510, 512, 85 S.Ct. 678]; *Barrows* v. *Jackson* (1953) 346 U.S. 249, 257 [97 L.Ed. 1586, 595, 73 S.Ct. 1031]; *Parrish* v. *Civil Service Com.,* 66 Cal.2d 260, 264 57 Cal.Rptr. 623, 425 P.2d 223].)

[6]E.g., The maternal death rate in 1966 was 0.5 per 100,000 population nd 29.1 per 100,000 births. (Statistical Abstract of the United States 1968) table 73, at p. 58, table 68, at p. 55.) In California in 1966 the aternal death rate was 2.1 per 10,000 live births (California Statistical bstract (1968) table E-3, at p. 67.) As to a particular pregnant woman e risk of death may be greater or lesser.

964

(1965) 380 U.S. 89, 96 [13 L.Ed.2d 675, 680, 85 S.Ct. 77
[fundamental but nonenumerated right to vote] ; *Aptheker*
*Secretary of State* (1964) 378 U.S. 500, 505-506 [12 L.Ed.
992, 996-997, 84 S.Ct. 1659], and *Kent* v. *Dulles* (1958) 3
U.S. 116, 125 [2 L.Ed.2d 1204, 1209, 78 S.Ct. 1113] [right
travel] ; *Bolling* v. *Sharpe* (1954) 347 U.S. 497, 500 [98 L.E
884, 887, 74 S.Ct. 693] [right to attend federal unsegregat
schools] ; *Otsuka* v. *Hite,* 64 Cal.2d 596, 602 [51 Cal.Rptr. 2
414 P.2d 412] [right to vote] ; cf. *Finot* v. *Pasadena Ci*
*Board of Education,* 250 Cal.App.2d 189, 199 [58 Cal.Rp
520].) It is not surprising that none of the parties who ha
filed briefs in this case have disputed the existence of th
fundamental right.

The critical issue is not whether such rights exist, b
whether the state has a compelling interest in the regulati
of a subject which is within the police powers of the sta
(*Shapiro* v. *Thompson* (1969) 394 U.S. 618, 634 [22 L.E
2d 600, 615, 89 S.Ct. 1322] ; *Sherbert* v. *Verner* (196
374 U.S. 398, 403 [10 L.Ed.2d 965, 969, 83 S.Ct. 1790]
whether the regulation is "necessary . . . to the accomplis
ment of a permissible state policy" (*McLaughlin* v. *Flori*
(1964) 379 U.S. 184, 196 [13 L.Ed.2d 222, 230, 85 S.Ct. 283
see also, *N.A.A.C.P.* v. *Button,* 371 U.S. 415, 438 [9 L.Ed.
405, 421, 83 S.Ct. 328] ; *Bates* v. *Little Rock* (1960) 361 U.
516, 527 [4 L.Ed.2d 480, 488, 80 S.Ct. 412] ; *Huntley* v. *Publ*
*Utilities Com.,* 69 Cal.2d 67, 74 [69 Cal.Rptr. 605, 442 P.
685] ; *Vogel* v. *County of Los Angeles,* 68 Cal.2d 18, 21 [
Cal.Rptr. 409, 434 P.2d 961] ; *People* v. *Woody,* 61 Cal.2d 71
718 [40 Cal.Rptr. 69, 394 P.2d 813]), and whether legislati
impinging on constitutionally protected areas is narrow
drawn and not of "unlimited and indiscriminate sweep
(*Shelton* v. *Tucker* (1960) 364 U.S. 479, 490 [5 L.Ed.2d 23
238, 81 S.Ct. 247] ; see also, *Cantwell* v. *Connecticut* (194
310 U.S. 296, 308 [84 L.Ed. 1213, 1220, 60 S.Ct. 900, 12
A.L.R. 1352] ; *In re Berry,* 68 Cal.2d 137, 151 [65 Cal.Rpt
273, 436 P.2d 273] ; *In re Hoffman,* 67 Cal.2d 845, 853-854 [
Cal.Rptr. 97, 434 P.2d 353]).

It is possible that the definition suggested by respon
ent, requiring that death be certain, was that intended by th
Legislature when the first abortion law was adopted in 185
and that, in the light of the then existing medical and surg
cal science, the great and direct interference with a woman
constitutional rights was warranted by considerations of th
woman's health. When California's first anti-abortion statut

was enacted, any surgical procedure which entered a body cavity was extremely dangerous. Surgeons did not know how to control infection, and mortality was high. (Haagensen & Lloyd, A Hundred Years of Medicine (1943) p. 19.) In 1867 Joseph Lister first published his findings on antiseptic surgery (*id.*, at pp. 241-242), but even in 1883 the techniques he developed were condemned (*id.*, at p. 245), and as late as 1895 were not well understood or properly applied by even leaders of the medical profession. (*Id.*, at p. 246; see also, H. Robb (1895) Aseptic Surgical Technique.)

Although development was slow, techniques of antisepsis and asepsis became major general advances in surgery at and after the turn of the century. In due course safe procedures were developed for specific operations. Curettage, used for abortion in the first trimester, became a safe, accepted and routinely employed medical technique, especially after antibiotics were developed in the early 1940's. (Douglas, *Toxic Effects of the Welch Bacillus in Postabortal Infections* (1956) 56 N.Y.State J.Med. 3673.) It is now safer for a woman to have a hospital therapeutic abortion during the first trimester than to bear a child.[7]

Although abortions early in pregnancy, and properly performed present minimal danger to the woman, criminal[8] abortions are "the most common single cause of maternal deaths in California." (Fox, *Abortion Deaths in California* (1967)

---

[7] C. Tietze & H. Lehfeldt, *Legal Abortion in Eastern Europe* (April 1961) 175 J.A.M.A. 1149, 1152; see also V. Kolblova, *Legal Abortion in Czechoslovakia* (April 1966) 196 J.A.M.A. 371; K.H. Mehland, *Combatting Illegal Abortion in the Socialist Countries of Europe* (1966) 13 World Med.J. 84. There are, of course, no comparable data in the United States. However, in California from November 1967 through September 1968, 3,775 therapeutic abortions were reported without a maternal death. (See Annual Report on the Implementation of the Therapeutic Abortion Act, Department of Public Health, Bureau of Maternal and Child Health (January 1969), table 1.)

The only data contrary to the conclusions above is provided by the amicus for respondent, relying on Swedish data showing that maternal mortality from abortion is slightly higher than maternal mortality from giving birth. The Swedish figures are, however, explainable by the fact that abortions in Sweden are often performed during late pregnancy. (See Tietze & Lehfeldt, *supra*, 175 J.A.M.A. 1149, 1152 (e.g., in 1949, 15 percent of Swedish abortions were performed after the first trimester); Hoffmeyer, *Medical Aspects of the Danish Legislation on Abortions* (1965) 17 W.Res.L.Rev. 529, 544-545.)

[8] The phrases "criminal abortion" and "illegal abortion" are used by the medical profession—and by legal commentators—to encompass all abortions obtained other than from a physician in an accepted surgical environment. Any use of the phrase "criminal abortion" or "illegal abortion" in this opinion merely adopts the common phraseology; no legal conclusion is intended.

98 Am.J.Obst. & Gynec. 645, 650.) In California, it is est
mated that 35,000 to 100,000 such abortions occur each yea
(Fox, *supra*, at p. 645.)

The incidence of severe infection from criminal abortion
very much greater than the incidence of death. The L
Angeles County Hospital alone, for example, in 1961 admitte
over 3,500 patients treated for such abortions. (Kistner, *Med*
*cal Indications for Contraception: Changing Viewpoints* (ed
torial) (1965) 25 Obst. & Gynec. 285, 286.) Possibly mor
significant than the mere incidence of infection caused b
criminal abortions is the result of such infection. "Induce
Illegal Abortion . . . is one of the important causes of subse
quent infertility and pelvic disease." (Kleegman & Kau
man, Infertility in Women (1966) p. 301; see also Curtis
Huffman, Gynecology (6th ed. 1950) pp. 565, 566.)[9]

Amici for appellant, 178 deans of medical schools, includin
the deans of all California medical schools, chairmen of med
cal school departments, and professors of medical school
state: "These recorded facts bring one face-to-face with th
hard, shocking—almost brutal—reality that our statute d
signed in 1850 to protect women from serious risks to life an
health has in modern times become a scourge."[10]

---

[9] There is considerable literature describing the experience of variou
hospitals with infected abortion. Hospital experience, however, can b
assumed to be only the tip of the iceberg. Many badly infected wome
will be treated at home or in a doctor's office. (Reid, *Assessment an*
*Management of the Seriously Ill Patient Following Abortion* (Marc
1967) 199 J.A.M.A. p. 805.) See, for hospital data, Goodno, Cushne
Molumphey, *Management of Infected Abortion* (1963) 85 Am.J.Obst.
Gynec. 16 [Baltimore City Hospitals]; Knapp, Platt and Douglas, *Sept*
*Abortion* (1960) 15 Obst. & Gynec. 344 [The New York Hospital]
Moritz & Thompson, *Septic Abortion* (1966) 95 Am.J.Obst. & Gynec. 4
[Miami Valley Hospital, Dayton, Ohio]; Stevenson & Yang, *Septic Abor*
*tion With Shock* (1962) 83 Am.J.Obst. & Gynec. 1229 [Detroit Receivin
Hospital]; Studdiford & Douglas, *Placental Bacteremia: A Significan*
*Finding in Septic Abortion Accompanied by Vascular Collapse* (1956
71 Am.J.Obst. & Gynec. 842 [Bellevue Hospital, New York].)

[10] One of the amici in support of respondent agrees: "There is a sub
stantial risk that abortion performed by persons unauthorized to practic
surgery, carried out in unregulated places, will bring injury or even deat
to the mother."

Authorities recognizing and discussing the tragic health proble
created by illegal abortions are legion. (See, e.g., Bates, *The Abortio*
*Mill: An Institutional Study* (1954) 45 J.Crim.L.C. & P.S. 157; East
man, Expectant Motherhood (3d ed. 1957) 106 et seq.; Gold, Erhardt
Jacobziner & Nelson, *Therapeutic Abortions in New York City: A 20*
*Year Review* (1965) 55 Am.J.Pub.Health 964, 970-971; Guttmacher (e
1967) The Case for Legalized Abortion Now; Lader (1966) Abortion
Leavy & Kummer, *Criminal Abortion: Human Hardship and Unyieldin*
*Laws* (1962) 35 So.Cal.L.Rev. 123; Lucas, *Federal Constitutional Limit*

Although we may assume that the law was valid when first acted, the validity of the law in 1850 does not resolve the issue of whether the law is constitutionally valid today. Compare, e.g., *Gray* v. *Sanders* (1963) 372 U.S. 368, 381 [9 L.Ed.2d 821, 830, 83 S.Ct. 801], with *South* v. *Peters* (1950) 339 U.S. 276, 277 [94 L.Ed. 834, 836, 70 S.Ct. 641]; *Baker* v. *Carr* (1962) 369 U.S. 186, 237 [7 L.Ed.2d 663, 697, 82 S.Ct. 691], with *Colgrove* v. *Green* (1946) 328 U.S. 549, 556 [90 L.Ed. 1432, 1435, 66 S.Ct. 1198]; *Brown* v. *Board of Education* (1954) 347 U.S. 483, 495 [98 L.Ed. 873, 881, 74 S.Ct. 686, 38 A.L.R.2d 1180], with *Plessy* v. *Ferguson* (1896) 163 U.S. 537, 550-551 [41 L.Ed. 256, 260-261, 16 S.Ct. 1138].)

Constitutional concepts are not static. Our United States Supreme Court said, regarding the equal protection clause of the Fourteenth Amendment: "We agree, of course, with Mr. Justice Holmes that the Due Process Clause of the Fourteenth Amendment 'does not enact Mr. Herbert Spencer's Social Statics.' [Citation.] Likewise, the Equal Protection Clause is not shackled to the political theory of a particular era. In determining what lines are unconstitutionally discriminatory, we have never been confined to historic notions of equality, any more than we have restricted due process to a fixed catalogue of what was at a given time deemed to be the limits of fundamental rights. . . ." (*Harper* v. *Virginia Board of Elections* (1966) 383 U.S. 663, 669 [16 L.Ed.2d 169, 173, 86 S.Ct. 1079]; see also, *Perez* v. *Sharp, supra,* 32 Cal.2d 711, 727; *Galyon* v. *Municipal Court,* 229 Cal.App.2d 667, 671-672 [40 Cal.Rptr. 446], and cases cited therein ["[A] statute valid when enacted may become invalid by change in the conditions to which it is applied."]. See also, Means, *supra,* 14 N.Y.L.F. 411, 514-515.)

In the light of modern medical surgical practice, the great and direct infringement of constitutional rights which would result from a definition requiring certainty of death may not be justified on the basis of considerations of the woman's health where, as here, abortion is sought during the first trimester.

It is next urged that the state has a compelling interest in the protection of the embryo and fetus[11] and that such inter-

tions on the *Enforcement and Administration of State Abortion Statutes* (1968) 46 N.C.L.Rev. 730; Niswander, *Medical Abortion Practices in the United States* (1965) 17 W.Res.L.Rev. 403.)

[11]It has been pointed out that "embryo" is more accurately descriptive than "fetus" in the instant case. Webster's New International Dictionary, *supra,* states: ". . . In mammals . . . *embryo* is applied

est warrants the limitation on the woman's constitutio[n]
rights. Reliance is placed upon several statutes and cou[rt]
rules which assertedly show that the embryo or fetus is equi[v]
alent to a born child. However, all of the statutes and ru[les]
relied upon require a live birth or reflect the interest of t[he]
parents.[12]

In any event, there are major and decisive areas where t[he]
embryo and fetus are not treated as equivalent to the bo[rn]
child. Probably the most important is reflected by the statu[te]

only to early stages passed within the mother's body; later (in hum[an]
embryology, usually after the third month of development) the young
called a *fetus. . . .*'' (Italics in original.)

[12]Statutes classifying the unborn child as the same as the born chi[ld]
require that the child be born alive for the provisions to apply. (E.[g.]
Civ. Code, § 29 [''A child conceived, but not yet born, is to be deem[ed]
an' existing person, so far as may be necessary for its interests in t[he]
event of its subsequent birth; . . .'']; Prob. Code, § 250 [''A po[st]
humous child is considered as living at the death of the parent.'']; Pr[ob.]
Code, § 255 [An illegitimate child is the heir of his mother, whether bo[rn]
or conceived.'']:)

Similarly, cases holding that a child can recover for injuries caus[ed]
before his birth require that the child be born alive. The interest pr[o]
tected is that of the child; and the right attaches, not to the embryo[or]
fetus, but to the living child. (*Scott* v. *McPheeters,* 33 Cal.App.2d 62[0,]
637 [92 P.2d 678, 93 P.2d 562] [child injured at birth can bring actio[n]
for injuries]; see also, *Carroll* v. *Skloff* (1964) 415 Pa. 47 [202 A.2d
11]; *Tomlin* v. *Laws* (1922) 301 Ill. 616 [134 N.E. 24, 25]; Prosser, La[w]
of Torts (3d ed. 1964) at p. 356 [''The child, provided that he is bo[rn]
alive, is permitted to maintain an action. . . .''].)

Where the embryo or fetus is allowed to asserts rights before birth [it]
is the prospective mother or parents who are bringing the action; th[us]
it is their interest that the law protects. (*Kyne* v. *Kyne,* 38 Cal.App.2[d]
122, 127-128 [100 P.2d 806] [action on behalf of unborn child f[or]
support and to establish paternity]; *People* v. *Sianes,* 134 Cal.App. 35[0,]
357-358 [25 P.2d 487] [Criminal action for nonsupport against fath[er]
of unborn child]; *People* v. *Yates,* 114 Cal.App.Supp. 782, 786 [298 [P.]
961] [same].) Similarly, in those jurisdictions which recognize a caus[e]
of action for the loss of an unborn child, it is the parents' ''distressin[g]
wrong in the loss of a child'' that the law has recognized. (Prosse[r,]
*supra,* § 56, at p. 357; *Torigian* v. *Watertown News Co.* (1967) 352 Mas[s.]
446, 448 [225 N.E.2d 926].)

In a case involving a pregnant woman who refused a blood transfusio[n,]
in ordering the transfusion the court made clear that it was concerne[d]
with the woman, rather than the fetus: ''. . . Mrs. Jones wanted t[o]
live.'' (*Application of President & Directors of Georgetown Colleg[e]
Inc.* (D.C. Cir. 1964) 331 F.2d 1000, 1009 [118 App.D.C. 80, 9 A.L.R.3[d]
1367], cert. denied, 377 U.S. 978 [12 L.Ed.2d 746, 84 S.Ct. 1887]; bu[t]
see, *Raleigh Fitkin-Paul Morgan Memorial Hospital* v. *Anderson* (1964[)]
42 N.J. 421 [201 A.2d 537, 538], cert. denied, 377 U.S. 985 [12 L.Ed.2[d]
1032, 84 S.Ct. 1894]; suggesting that an 8-month pregnant woman coul[d]
be required to have blood transfusions to protect the unborn child.)

Although sections 3705 and 3706 of the Penal Code, which provide fo[r]
suspending the execution of a pregnant woman, reflect an interest in th[e]
unborn child, the sections do not affect any other significant privat[e]
interest and thus furnish no basis to evaluate the interest protected or t[o]
conclude that the embryo or fetus is equivalent to a born child.

fore us. The intentional destruction of the born child is murder or manslaughter. The intentional destruction of the embryo or fetus is never treated as murder, and only rarely as manslaughter but rather as the lesser offense of abortion. Perkins, Criminal Law, *supra*, p. 103; Means, *supra*, 14 .Y.L.F. at p. 445.)[13]

Furthermore, the law has always recognized that the pregnant woman's right to life takes precedence over any interest the state may have in the unborn. The California abortion statutes, as do the abortion laws of all 51 United States jurisdictions, make an exception in favor of the life of the prospective mother. (See Stern, *Abortion: Reform and the Law*, *supra*, 59 J.Crim.L.C. & P.S. 84, 86-87; George, *Current Abortion Laws: Proposals & Movements for Reform* (1965) 17 .Res.L.Rev. 366, 375.) Although there may be doubts as to whether the state's interest may ever justify requiring a woman to risk death, it is clear that the state could not forbid a woman to procure an abortion where, to a medical certainty, the result of childbirth would be death. We are also satisfied that the state may not require that degree of risk involved in respondent's definition, which would prohibit an abortion, where death from childbirth although not medically certain, would be substantially certain or more likely than not. Accordingly, the definition of the statute suggested by respondent must be rejected as an invalid infringement upon the woman's constitutional rights.

Another definition of the term "necessary to preserve" is suggested by *People* v. *Abarbanel*, *supra*, 239 Cal.App.2d 31, 32, 34, where the court held that an abortion was not unlawful where the obstetrician performed the abortion based on the "possibility" of suicide. *Abarbanel* might be understood as meaning that "necessary to preserve" refers to a possibility of death different from or greater than the ordinary risk of childbirth. To so interpret "necessary to preserve" would mean that in nearly every case, if not all, a woman who wished an abortion could have one. A woman who is denied a desired lawful abortion and forced to continue an unwanted pregnancy would seem to face a greater risk of death, because of psychological factors, than the average woman, because the average includes all those women who wish to bear the child

[13]One case has held that, for purposes of the manslaughter and murder statutes, human life may exist where childbirth has commenced but has not been fully completed. (*People* v. *Chavez*, 77 Cal.App.2d 621, 624, 626 [176 P.2d 92].)

to term. The psychological factor alone, which under *Ababánel* is a proper consideration, would seem to be decisiv Such a construction of the statute permitting voluntary abo tions would render the statute virtually meaningless. Mor over to determine the right to an abortion solely on the bas of the dangers of childbirth without regard to the relativ dangers of the abortion would be contrary to good medic practice.

Nor can the statute be made certain by reading it "substantially or reasonably" necessary to preserve the li of the mother. In the present context those terms are n sufficiently precise and would be subject to such differe interpretations as to add little or nothing to "necessary. Thus, many people may feel that an abortion is reasonably substantially necessary to preserve life where the risk of deat is double or triple the ordinary risk in childbirth. Others ma believe that anything which increases the possibility of deat is a substantial risk which is not to be undertaken in th absence of countervailing considerations, so that "reasonabl necessary" or "substantially necessary" becomes as destruc tive of the statute as "possibility of death." On the othe hand, there may be those who feel that there is no reasonabl or substantial necessity until it is more likely than not tha the pregnant woman will not survive childbirth. Although i other contexts the implication of words such as "reasonably and "substantially" may add certainty and avoid other du process objections, in the instant situation the implication o such words would merely increase the uncertainty.

There is one suggested test which is based on policy underlying the statute and which would serve to mak the statute certain. The test is probably in accord with th legislative intent at the time the statute was adopted. Th Legislature may have intended in adopting the statute tha abortion was permitted when the risk of death due to th abortion was less than the risk of death in childbirth and tha otherwise abortion should be denied. As we have seen, at th time of the adoption of the statute abortion was a highl dangerous procedure, and under the relative safety test abor tion would be permissible only where childbirth would be eve more dangerous. In light of the test and the then existing medical practice, the question whether abortion should b limited to protect the embryo or fetus may have been immate rial because any such interest would be effectuated by limiting

ortions to the rare cases where they were safer than childbirth.

The suggested test would involve an application of medical principles. Medical science may be able to tell us the proper method to treat a patient to minimize the risk of death, but without resort to matters outside medical competence, it cannot tell us the circumstances in which the safest treatment should be rejected and a more dangerous treatment followed in order to protect an embryo or fetus.

The new Therapeutic Abortion Act (Health & Saf. Code, § 25950-25954), has adopted a test analogous to the suggested one. Under the new statute, abortion is permissible during the first 20 weeks of pregnancy by a licensed physician in an accredited hospital (Health & Saf. Code, §§ 25951, 25953) if it is determined under prescribed procedures either that "There is substantial risk that continuance of the pregnancy would gravely impair the physical or mental health of the mother" (Health & Saf. Code, § 25951, subd. (c) (1)), or that "The pregnancy resulted from rape or incest." (Health & Saf. Code, § 25951, subd. (c) (2).) Mental health includes mental illness to the extent that the woman would be dangerous to herself. (Health & Saf. Code, § 25954.) By limiting the abortion to the first 20 weeks, the Legislature has taken into account the danger to the mother of the later abortion and, by requiring the abortion to be performed by a licensed physician in an accredited hospital, has recognized the danger to the mother of other procedures. The further criteria for determining whether an abortion is permissible is the pregnant woman's physical and mental health. Thus, the test established is a medical one, whether the pregnant woman's physical and mental health will be furthered by abortion or by bearing the child to term, and the assessment does not involve considerations beyond medical competence. There is nothing to indicate that in adopting the Therapeutic Abortion Act the Legislature was asserting an interest in the embryo.

Although the suggested construction of former section 274, making abortion lawful where it is safer than childbirth and unlawful where abortion is more dangerous, may have been in accord with legislative intent, the statute may not be upheld against a claim of vagueness on the basis of such a construction. The language of the statute, "unless the same is necessary to preserve her life," does not suggest a relative safety test, and no case interpreting the statute has suggested that

the statute be so construed. None of the parties or numerou
amici who have filed briefs in the instant case suggest that th
statute applies a relative safety test; to the contrary, the pos
tion of the parties and amici, including numerous lawyer
doctors, educators, clergymen and laymen, implies that th
statute does not apply that standard. Thus, those claiming th
statute is invalid urge that the only valid standard would be
relative safety test and that the statute fails to adopt such
test, and those urging the validity of the statute either sta
or imply that the standard applied is more restrictive. In th
circumstances, we are satisfied that the statute may not b
construed to adopt the relative safety test as against a clai
of vagueness, because the language does not suggest that te
and because of the practical evidence before us that men
"common" intelligence, indeed of uncommon intelligenc
have not guessed at this meaning.[14]

The problem caused by the vagueness of the statu
is accentuated because under the statute the doctor is, i
effect, delegated the duty to determine whether a pregnar
woman has the right to an abortion and the physician acts a
his peril if he determines that the woman is entitled to a
abortion. He is subject to prosecution for a felony and t
deprivation of his right to practice medicine (Bus. & Pro
Code, § 2377) if his decision is wrong. Rather than bein
impartial, the physician has a "direct, personal, substantia
pecuniary interest in reaching a conclusion" that the woma
should not have an abortion. The delegation of decision
making power to a directly involved individual violates th

[14]The practical aspects of the need to guess at the meaning of th
abortion statute is shown by Packer & Gampell, *Therapeutic Abortion*
*A Problem in Law and Medicine* (1959) 11 Stan.L.Rev. 417. A que
tionnaire survey directed to 29 San Francisco Bay Area and Los Angele
hospitals (*id.*, at p. 423) based on hypothetical cases involving pregnar
women seeking abortions yielded the following results (*id.*, at p. 444)

| Case No. | Author's Evaluation of Legality of Abortion | Hospital Would Perform Abortion Yes | N |
|---|---|---|---|
| 1 | Yes | 21 | |
| 2 | No | 10 | 1 |
| 3 | No | 6 | 1 |
| 4 | No | 15 | |
| 5 | No | 8 | 1 |
| 6 | No | 8 | 1 |
| 7 | Yes | 17 | |
| 8 | No | 5 | 1 |
| 9 | Prob.Yes | 10 | 1 |
| 10 | Maybe | 17 | |
| 11 | No | 1 | 2 |

...rteenth Amendment. (*Tumey* v. *Ohio* (1927) 273 U.S. 510, ...[71 L.Ed. 749, 754, 47 S.Ct. 437, 50 A.L.R. 1243] ; see also ...*te Board of Dry Cleaners* v. *Thrift-D-Lux Cleaners, Inc.*, ...Cal.2d 436, 448 [254 P.2d 29] ["[T]he statute assumes to ...fer legislative authority upon those who are directly inter- ...ed in the operation of the regulatory rule. . . ."]; *Blu- ...nthal* v. *Board of Medical Examiners*, 57 Cal.2d 228, 235 ...Cal.Rptr. 501, 368 P.2d 101].)

...he inevitable effect of such delegation may be to deprive a ...man of an abortion when under any definition of section ...of the Penal Code, she would be entitled to such an opera- ...n, because the state, in delegating the power to decide when ...abortion is necessary, has skewed the penalties in one di- ...tion: *no* criminal penalties are imposed where the doctor ...uses to perform a necessary operation, even if the woman ...uld in fact die because the operation was not performed.

...he pressures on a physician to decide not to perform an ...olutely necessary abortion are, under section 274 of the ...nal Code, enormous, and because section 274 authorizes— ...l requires—the doctor to decide, at his peril, whether an ...rtion is necessary, a woman whose life is at stake may be ...effectively condemned to death as if the law flatly prohib- ...d all abortions.

...To some extent the Therapeutic Abortion Act reduces these ...essures. The act specifically authorizes an abortion by a ...ensed physician in an accredited hospital where the abor- ...n is approved in advance by a committee of the medical ...ff of the hospital, applying medical standards. (Health & ...f. Code, § 25951.) At least in cases where there has been ...herence to the procedural requirements of the statute, ...ysicians may not be held criminally responsible, and a jury ...y not subsequently determine that the abortion was not ...thorized by statute.

We conclude that the validity of section 274 of the ...nal Code before amendment cannot be sustained.[15]

Since section 274 is invalid, Dr. Belous' conviction for vio- ...ion of section 182 of the Penal Code, conspiracy to commit

---

[15] It has been urged that the Therapeutic Abortion Act is unconsti- ...ional because it contains uncertainties similar to those in the repealed ...tute, because it infringes on the woman's right to choose whether to ...ir children, and because the act does not expressly permit an abortion ...ere there is a likelihood that a deformed child will be born. Since the ...was adopted after the abortion in the instant case, we do not reach ...e issue of its validity.

abortion, must likewise fall. The judgment is reversed w
directions to the trial court to dismiss the indictment.

Traynor, C. J., Tobriner, J., and Pierce, J. pro tem.,* c
curred.

BURKE, J.—I dissent.

The defendant was found guilty by jury trial of a wil
violation of the abortion statute as it existed at the time of
offense. That he violated the statute is all but conceded in
briefs filed in his behalf. Although he testified that he
rected the young couple to a doctor, unlicensed in Californ
because he believed that if they carried out their threats
going to Tijuana to procure an abortion the young woma
life would be in danger, he acknowledged upon cro
examination that her life would not have been endangered
she were not aborted. His assertions that he acted in go
faith and out of compassion are tainted somewhat by the e
dence which showed that he had referred other women to
same unlicensed physician on a number of occasions and th
he had participated on at least one-half of those occasions
the fee paid the abortionist.

Had the doctor truly believed that the young woman's l
was in danger he could have done what was the common pr
tice of taking the patient to one of the several hospitals
which therapeutic abortions were being performed. To
knowledge there is not one single instance of a decision of t
appellate courts of this state in which a doctor or a hospi
has been prosecuted for the performance of an abortion whe
an independent hospital committee deemed the abortion to
necessary to preserve the woman's life. The plain fact is,
the jury found it to be, that this doctor, whatever his moti
possessed the intent to assist in procuring the miscarriage
the woman for reasons other than to preserve her life. This
the specific intent which the law requires for conviction.

He supplied to the jury the answer an independent hospi
committee undoubtedly would have given him had he seen
to seek its approval for an abortion—the patient could be
the child without endangering her life; therefore, to abort h
would violate the law.

The threatened danger to the woman's life arose only fro
the couple's assertions that they would seek an illegal abo
tion by an unlicensed person. To assist them in attaining th

*Assigned by the Chairman of the Judicial Council.

goal was to flaunt his profession's own standards and to aid in bringing about a direct violation of the law.

The majority would reverse the conviction by declaring the statute unconstitutional because of asserted uncertainty in the phrase, ''necessary to preserve [the woman's] life.''[1] This phrase has been an integral part of the California law against illegal abortions from the time of its enactment in 1872 until the 1967 amendment to the section, and similar language was in the original statute adopted in 1850.[2] Thus for over a hundred years in this state doctors, hospital committees, judges, lawyers and juries have been called upon to give the phrase the common sense interpretation which the words appear to me to suggest. For this court over a hundred years later to find the language unconstitutionally vague and uncertain is a ''negation of experience and common sense.'' (*United States* v. *Ragen,* 314 U.S. 513, 524 [86 L.Ed. 383, 390, 62 S.Ct. 374].)

Not only was the phrase long used in the California statute, it was also employed at common law (see, e.g., Perkins on Criminal Law (2d ed.) p. 145; Clark and Marshall, Crimes (6th ed.) pp. 688-689) and is or has been in the abortion statutes of many states (see, e.g., Am.Jur.2d, Abortion, § 9, p. 192; 153 A.L.R. 1218, 1266; Smith, Abortion and the Law (1967) p. 7). Implicit in the decisions of this court, as well as those of countless other courts, is the view that the phrase does not render such a statute invalid (see, e.g., *People* v. *Davis,* 43 Cal.2d 661 [276 P.2d 801]; *People* v. *Gallardo,* 41 Cal.2d 57 [257 P.2d 29]; *People* v. *Powell,* 34 Cal.2d 196 [208 P.2d 974]; *People* v. *Wilson,* 25 Cal.2d 341 [153 P.2d 720]; *People* v. *Rankin,* 10 Cal.2d 198 [74 P.2d 71]). In *State* v. *Moretti* 52 N.J. 192 [244 A.2d 499, 504] (cert. den. 393 U.S. 952 [21 L.Ed.2d 363, 89 S.Ct. 376]) the court stated that when the phrase ''lawful justification,'' as used in a statute prohibiting abortions done maliciously or without lawful justification, is confined ''to the preservation of the mother's

---

[1]Section 274 then read: ''Every person who provides, supplies, or administers to any woman, or procures any woman to take any medicine, drug, or substance, or uses or employs any instrument or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is *necessary to preserve her life,* is punishable . . . .'' (Italics added.)

[2]The 1850 statute (ch. 99, § 45, p. 233) provided that every person who did any of the enumerated acts with a specified intent shall be punishable ''*Provided,* that no physician shall be affected . . . who, in the discharge of his professional duties, deems it necessary to produce the miscarriage of any woman in order to save her life.''

life," the statute is not subject to constitutional attack on the ground of vagueness. (See also *State* v. *Elliott,* 234 Ore. 522 [383 P.2d 382, 384-385].)

The proper test as to certainty was stated by this court in *People* v. *Howard,* 70 Cal.2d 618, 624 [75 Cal.Rptr. 761, 451 P.2d 401], to be: " 'A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions, but it cannot be held void for uncertainty if any reasonable and practical construction can be given to its language. As stated in *Pacific Coast Dairy* v. *Police Court,* 214 Cal. 668, at page 676 . . . "Mere difficulty in ascertaining its meaning, or the fact that it is susceptible of different interpretations will not render it nugatory. Doubts as to its construction will not justify us in disregarding it." [Citations.] ' "

The meaning of the phrase "necessary to preserve [the woman's] life" was considered in *People* v. *Ballard,* 167 Cal.App.2d 803, 814-815 [335 P.2d 204], wherein the court stated, "Surely, the abortion statute (Pen. Code, § 274) does not mean by [this phrase] that the peril to life be imminent. It ought to be enough that the dangerous condition 'be potentially present, even though its full development might be delayed to a greater or less extent. Nor was it essential that the doctor should believe that the death of the patient would be otherwise *certain* in order to justify him in affording present relief.' (*State* v. *Dunklebarger,* 206 Iowa 971 [221 N.W. 592, 596] ; see also *Rex* v. *Bourne,* 1 K.B. 687 . . .; *Commonwealth* v. *Wheeler,* 315 Mass. 294 [53 N.E.2d 4] ; 23 So.Cal.L.Rev. 523.) In *State* v. *Powers* . . . 155 Wash. 63, 67 [283 P. 439, 440], the court satisfied itself with an interpretation of 'necessity to save life' by stating, '*If the appellant in performing the operation did something which was recognized and approved by those reasonably skilled in his profession practicing in the same community . . . then it cannot be said that the operation was not necessary to preserve the life of the patient.*' " (Italics added.) (See also *People* v. *Abarbanel,* 239 Cal.App.2d 31, 34 [48 Cal.Rptr. 336] ; *People* v. *Ballard,* 218 Cal.App.2d 295, 307 [32 Cal.Rptr. 233].)

Amici for appellant, 178 deans of medical schools, state that the italicized sentence quoted from *People* v. *Ballard, supra,* 167 Cal.App.2d 803, 814-815, is in error because "the medical profession has 'approved' abortions in cases [in which the objective was not to preserve the life of the woman and therefore] clearly outside of Penal Code section 274. Packer &

Gampell, Therapeutic Abortion : A Problem in Law and Medicine, 11 Stan.L.Rev. 417, 447. . . ." However, that sentence must be understood to mean recognized and approved by such persons as being required to preserve the life of the patient.

The word "preserve" is defined in the dictionary as "1. To keep or save from injury or destruction; . . . to protect; save. 2. To keep in existence or intact; . . . To save from decomposition. . ..." (See Webster's New Internat. Dict. (3d ed. 1961).) As used in section 274, the word "preserve" has been regarded as synonomous with "save" (see, e.g., *People* v. *Kutz,* 187 Cal.App.2d 431, 436 [9 Cal.Rptr. 626]; *People* v. *Malone,* 82 Cal.App.2d 54, 59 [185 P.2d 870]; *Stern* v. *Superior Court,* 78 Cal.App.2d 9, 18 [177 P.2d 308]), and to save a life ordinarily is understood as meaning to save from destruction, i.e. dying—not merely from injury. Thus the precipitation of a psychosis in the absence of a genuine threat of suicide is not a threat to life under section 274. (See Packer and Gampell, *Therapeutic Abortion: A Problem in Law and Medicine,* 11 Stan.L.Rev. 417, 433, 436.)

That the Legislature used the word "preserve" in the sense of save from destruction also appears from the purpose of the section. The law historically in various contexts has regarded the unborn child as a human being. (See Louisell, *Abortion, The Practice of Medicine, and the Due Process of Law,* 16 U.C.L.A. L.Rev. 233, 234-244.) Louisell (at p. 244) quotes from Prosser on Torts (3d ed. 1964) that "[M]edical authority has recognized long since that the child is in existence from the moment of conception, and for many purposes its existence is recognized by the law. The criminal law regards it as a separate entity, and the law of property considers it in being for all purposes which are to its benefit, such as taking by will or descent. . . . All writers who have discussed the problem have joined . . . in maintaining that the unborn child in the path of an automobile is as much a person in the street as the mother." In *Raleigh Fitkin-Paul Morgan Memorial Hospital* v. *Anderson,* 42 N.J. 421 [201 A.2d 537, 538] (cert. den. 377 U.S. 985 [12 L.Ed.2d 1032, 84 S.Ct. 1894]) it was held that an unborn child of a woman who did not wish blood transfusions because they were contrary to her religious convictions was entitled to the law's protection and that an order would be made to insure such transfusions to the mother in the event they are necessary in the opinion of the attending physician.

Several statutes show that the California law has been in

accord in regarding the unborn child as a human being for various purposes. (See e.g., Pen. Code, §§ 3706 and 270; Civ. Code, § 29.)[3] In *Scott* v. *McPheeters,* 33 Cal.App.2d 629, 634 [92 P.2d 678, 93 P.2d 562], the court declared: "The respondent asserts that the provisions of section 29 of the Civil Code are based on a fiction of law to the effect that an unborn child is a human being separate and distinct from its mother. We think that assumption of our statute is not a fiction, but upon the contrary that it is an established and recognized fact by science and by everyone of understanding."

It is reasonable to believe that section 274, as it read at the time in question, was not an exception to the law's attitude respecting the unborn child as a human being and that it was designed to protect not only the mother's life but also that of the child. In view of that purpose it would appear that the Legislature intended that the child would be deprived of his right to life only if in the absence of an abortion there was a danger of the mother's death—not merely of injury to her.

"'[T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. . . .' *United States* v. *Petrillo,* 332 U.S. 1, 7-8 [91 L.Ed. 1877, 67 S.Ct. 1538]." *(Roth* v. *United States,* 354 U.S. 476, 491 [1 L.Ed.2d 1498, 1510, 77 S.Ct. 1304].) The phrase in question, when applied according to the standard heretofore stated (namely, whether persons reasonably skilled in their profession practicing in the same community recognized and approved the act as being required to save the patient from dying) clearly gives such warning.

Furthermore, section 274 punishes only those who act with "' . . . the intent to commit a criminal abortion, that is, an abortion for a purpose other than to preserve [i.e. save from destruction] the life of the mother.'" *(People* v. *Abarbanel. supra,* 239 Cal.App.2d 31, 34-35; *People* v. *Ballard, supra,* 167 Cal.App.2d 803, 817.) The requirement of such an intent eviscerates much of the majority's claim that the section is

---

[3]Penal Code section 3706 requires that the execution of a death penalty be suspended if the defendant is pregnant and without regard to the stage of pregnancy.

Penal Code section 270 makes punishable a father's wilful failure to provide a minor child with necessary items and provides that "A child conceived but not yet born is to be deemed an existing person in so far as this section is concerned."

Civil Code section 29 provides in part that "A child conceived, but not yet born, is to be deemed an existing person, so far as may be necessary for its interests in the event of its subsequent birth . . . ."

impermissibly vague. (See generally *Mishkin* v. *New York*, 383 U.S. 502, 507, fn. 5 [16 L.Ed.2d 56, 61, 86 S.Ct. 958]; *Boyce Motor Lines, Inc.* v. *United States*, 342 U.S. 337, 342 [96 L.Ed. 367, 372, 72 S.Ct. 329].) A person who performs an abortion with such an intent has fair warning that his conduct may violate the law even though he may not be certain where the jury will draw the line on the matter of necessity.

The principal cases relied upon by the majority, in which statutes have been declared unconstitutionally vague, do not support such a finding when applied to the abortion statute. In *People* v. *McCaughan*, 49 Cal.2d 409 [317 P.2d 974], the statute prohibited, among other conduct, "harsh" or "unkind" treatment of a mentally ill person. These words were held not to have an established meaning either at common law or as a result of adjudication. They were held unconstitutionally vague. On the other hand, the phrase "neglect of duty" and the word "cruel" were upheld because they did have such well established meanings; just as do the words utilized in the phrase under attack here.

*Lanzetta* v. *New Jersey*, 306 U.S. 451, 453 [83 L.Ed. 888, 890, 59 S.Ct. 618], construed a statute defining "gangster" and making it a crime for anyone to be such a person. The phrase "consisting of two or more persons" was all that purported to define "gang," and the word "gang" was held so vague and uncertain as to violate the Fourteenth Amendment.

*Connally* v. *General Constr. Co.*, 269 U.S. 385, 395 [70 L.Ed. 322, 329, 46 S.Ct. 126], involved a statute requiring a contractor to pay his employees "not less than the *current rate of . . . wages* in the *locality* where the work is performed," and the court held the italicized words unconstitutionally vague. Unlike the statute involved here, the statute in question was a new statute and the court noted that its application "depends not upon a word of fixed meaning in itself, or one made definite by statutory or judicial definition. . . ."

In contrast to these cases, here the challenged statute has a fixed meaning, frequently applied and impliedly interpreted by the courts in the more than one hundred years of its existence. In addition, the statute requires proof of the specific intent to commit a criminal abortion before a person may be successfully prosecuted under it.

There is, of course, a presumption in favor of constitutionality, and the invalidity of a legislative act must be clear

980

before it can be declared unconstitutional. (*In re Anderson,* 69 Cal.2d 613, 628 [73 Cal.Rptr. 21, 447 P.2d 117.)

The majority cite no authority holding that the term "necessary to preserve [the woman's] life" is impermissibly vague, and I agree with the conclusion as to the constitutionality of the section that is implicit in the multitude of past decisions affirming convictions for illegal abortion, and for murder where death was the result of such an act.

I would affirm the judgment.

McComb, J., and Sullivan, J., concurred.

SULLIVAN, J., Dissenting.—I concur in the views of Justice Burke. Reading the majority's attack on Penal Code section 274, one would think that the English language which has been the sensitive instrument of our system of law for over 500 years, has lost, by the mere passage of time, all capacity for clarity of expression. The majority strike down the statute solely because they find so vague and uncertain as to offend constitutional standards of due process, a single brief clause of nine words of long and common usage: "unless the same is necessary to preserve her life." There is no mystique enveloping the statute and, as Justice Burke points out, the clause now challenged has stood the test of over a hundred years, and presumably of countless human incidents falling within its scope, apparently without evoking a single whimpering cry against it.

The mandate of the section is plain and clear, and simply means this: no one shall intentionally procure the miscarriage of a woman unless it is necessary to save her life. "The criminal intent necessary to support a conviction of illegal abortion must show that it was performed for a purpose other than to save the abortee's life." (*People* v. *Abarbanel* (1965) 239 Cal.App.2d 31, 34 [48 Cal.Rptr. 336].) I dare say that the average man in the street, confronted with this law, would have little trouble in extracting its sense (we hold him accountable to much more complicated enactments) ; and the doctor, with his professional training and expertise would have even less. We have said that "[i]t is a cardinal rule to be applied to the interpretation of particular words, phrases, or clauses in a statute or a constitution that the entire substance of the instrument or of that portion thereof which has relation to the subject under review should be looked to in order to determine the scope and purpose of the particular

provision therein of which such words, phrases, or clauses form a part; and in order also to determine the particular intent of the framers of the instrument in that portion thereof wherein such words, phrases, or clauses appear." (*Wallace* v. *Payne* (1925) 197 Cal. 539, 544 [241 P. 879].) In the case before us, the challenged clause when so examined, is clear in meaning.

Yet the majority, by engaging in a process of elaborate and lavish analysis, transform that which is simple and lucid into something complex and arcane. Actually the analysis is focused on only three words: "necessary to preserve." Their fair equivalent is "necessary to save" (see *People* v. *Abarbanel, supra,* 239 Cal.App.2d 31, 34; *People* v. *Ballard* (1959) 167 Cal.App.2d 803, 814, 817 [335 P.2d 204]). Rather than evaluate these words in the light of "the entire substance" (see *Wallace* v. *Payne, supra,* 197 Cal. 539, 544), the majority resort to a dissection: "There is, of course, no standard definition of 'necessary to preserve' and taking the words separately, no clear meaning emerges." (*Ante,* pp. 960-961.) In support of this thesis, it is asserted that the word "necessary" does not have a "fixed meaning." In general, few words do.[1] It is further insisted that the definition of "preserve" is "even less enlightening." Accordingly, the majority discard its obvious meaning, that is, "save," as used in the context "to save a life." From such analysis, the opinion concludes "that the term 'necessary to preserve' in section 274 of the Penal Code is not susceptible of a construction that does not violate legislative intent and that is sufficiently certain to satisfy due process requirements without improperly infringing on fundamental constitutional rights." (*Ante,* p.

[1] "Words, however, do not have absolute and constant referents. 'A word is a symbol of thought but has no arbitrary and fixed meaning like a symbol of algebra or chemistry, . . .' (*Pearson* v. *State Social Welfare Board* (1960) 54 Cal.2d 184, 195 [5 Cal.Rptr. 553, 353 P.2d 33].) The meaning of particular words or groups of words varies with the '. . . verbal context and surrounding circumstances and purposes in view of the linguistic education and experience of their users and their hearers or readers (not excluding judges). . . . A word has no meaning apart from these factors; much less does it have an objective meaning, one true meaning.' (Corbin, *The Interpretation of Words and the Parole Evidence Rule* (1965) 50 Cornell L.Q. 161, 187.)" (*Pacific Gas & Elec. Co.* v. *G. W. Thomas Drayage Etc. Co.* (1968) 69 Cal.2d 33, 38 [69 Cal.Rptr. 561, 442 P.2d 641].)

"Words are used in an endless variety of contexts. Their meaning is not subsequently attached to them by the reader but is formulated by the writer and can only be found by interpretation in the light of all the circumstances that reveal the sense in which the writer used the words." (*Universal Sales Corp.* v. *California etc. Mfg. Co.* (1942) 20 Cal.2d 751, 776 [128 P.2d 665], Traynor, J., concurring.)

960.) Actually the gist of this is that the three words ''necessary to preserve'' are so shrouded in darkness that the average man cannot detect what they mean although average men and men above average have had no trouble with them for a hundred years.

I cannot accept so tortured a conclusion, wrenched from a statute which has had its roots in the law's historic solicitude for the priceless gift of life. The statute plainly prohibits an abortion unless it is necessary to save the mother's life. It strains reason to say that this crystal-clear exception to the law is ''so vague that men of common intelligence must necessarily guess at its meaning. . . .'' (*Lanzetta* v. *New Jersey* (1939) 306 U.S. 451, 453 [83 L.Ed. 888, 890, 59 S.Ct. 618], see *ante*, p. 960.) And it strains credulity to assume that this defendant, who under the evidence wilfully violated the statute, had to engage in any such guesswork with respect to the law governing his conduct.

I would affirm the judgment.

McComb, J., concurred.

Respondent's petition for a rehearing was denied October 1, 1969. Pierce, J. pro tem.,* sat in place of Mosk, J., who deemed himself disqualified. McComb, J., Burke, J., and Sullivan, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairman of the Judicial Council.